742 So.2d 997 (1999)
STATE of Louisiana
v.
Curtis HARRIS.
No. 97-KA-2903.
Court of Appeal of Louisiana, Fourth Circuit.
September 1, 1999.
*998 Harry F. Connick, District Attorney, Susan Erlanger Talbot, Assistant District Attorney, New Orleans, Louisiana, Counsel for Plaintiff/Appellee.
Christopher A. Aberle, Louisiana Appellate Project, Mandeville, Louisiana, Counsel for Defendant/Appellant.
Court composed of Judge JOAN BERNARD ARMSTRONG, Judge JAMES F. McKAY III, Judge MICHAEL E. KIRBY.
KIRBY, Judge.

I. STATEMENT OF THE CASE

On October 19, 1995, defendant, Curtis Harris, was indicted for first degree murder of Arthur Booker. Harris entered a plea of not guilty; after a two-day jury trial, the defendant was found guilty of manslaughter on January 29, 1997. The trial court sentenced the defendant to serve forty years at hard labor and denied defendant's motion to reconsider sentence. From this conviction and sentence, the defendant appeals.

II. STATEMENT OF THE FACTS

Steve Turner was living at 1929 Delachaise Street in March of 1995 with his brother, Shedrick Turner. In the early evening hours of March 19, 1995, Steve was visited by two friends, Jeffrey Cyprien and Arthur Booker. They sat around for awhile, and then Cyprien decided to smoke some crack cocaine. They went to Louisiana Avenue and purchased twenty dollars' worth of crack cocaine from someone they called "Wayne Foster"(later determined to be Duane Sanford.) Wayne told Steve he was going to pass by later that evening. *999 After purchasing the drugs, Steve, Booker and Cyprien returned to Steve's house.
Later that evening, Wayne arrived at 1929 Delachaise and yelled Steve's name. Steve opened the door and saw the defendant, who was holding a gun, standing behind Wayne. Wayne told Steve to get on the floor and not to make a sound; Steve complied with this order. Wayne stayed on the top step while the defendant went into the bedroom. Steve heard gunshots, then heard Cyprien say, "What did you do that for?" More gunshots followed. As the defendant was leaving the house, Steve asked, "What's up?" The defendant turned and shot him in the arm. The defendant then shot at him again and missed. Steve grabbed the gun and fought with the defendant. The defendant yelled for Wayne, but Wayne had gone. The defendant was able to wrest the gun away from Steve and fired again; however, the weapon misfired. Steve staggered down the stairs and collapsed outside.
Steve described the shooter having a dark complexion and a bush hair cut; Steve knew the shooter from the neighborhood but did not know his name. Steve was in great pain when the police officers arrived, but he remembered giving the officers Wayne Foster's name. Steve identified the defendant and Duane Sanford in photographic lineups. He also identified the defendant as the shooter at trial. Steve admitted to smoking crack cocaine but denied that his house was a crack house; Steve further stated that he did not allow anyone to do drugs in front of his younger brother, Shedrick.
Shedrick Turner testified that, on the evening of March 19, 1995, he was watching television in the front room of the house. Two men (Booker and Cyprien) came to visit his brother; Shedrick stated that his brother and the two men left for a short while and returned. A little while later, he heard someone say, "I don't have any money," then heard gunshots. Shedrick jumped out of the living room window and ran to his stepsister's house on Foucher Street where he called the police. Shedrick testified that after he jumped out of the window, he looked down the alleyway and saw a light skinned person.
Jeffrey Cyprien testified that on March 19, 1995, he and the victim, Arthur Booker, III, went shopping for a birthday gift for Cyprien's oldest son. After shopping, he and Booker went to visit Booker's friend, Steve Turner. He had gone into the bedroom to check on Booker; while he was doing this, the shooter came from behind him. Cyprien saw the perpetrator's leg and shoe. When Cyprien looked up, he saw a gun that was pointed to his head. Cyprien put his hand up and told the perpetrator that he did not have to hurt him and that he would give the perpetrator his money. The perpetrator shot him in the left knee and then after Cyprien had fallen, the perpetrator shot him in the neck.
Cyprien denied purchasing cocaine from Duane Sanford that evening. He stated that he sat in the kitchen and waited for Booker.
On March 19, 1995, New Orleans Police Officer Sidney Jackson, Jr. and his partner, Officer Stanley Stirgus, responded to a call of shots fired at 1929 Delachaise Street. When the officers arrived, they did not see anything, but a young woman named Yolanda Lawrence approached them and told them that there was a man in the side alley of 1929 Delachaise Street who had been shot. The officers located the subject, Steve Turner, and determined that he had been shot in the arm. Steve told the officers that there were others in the house. Officer Jackson requested an emergency medical unit. The officers entered the house from the rear entrance. The officers located another subject, Jeffrey Cyprian, in the kitchen. Cyprian had been shot multiple times and was lying on the kitchen floor; he appeared to be gasping for air. At this point, the officers requested another emergency medical *1000 unit. In the bedroom, the officer found another subject who had been shot in the head  the victim, Arthur Booker. Booker was already dead. The officers observed casings, a crack pipe and crack cocaine on the dresser in the bedroom.
Officer Stanley Stirgus testified that he and his partner, Sidney Jackson, responded to a call of gunshots fired at 1929 Delachaise Street; his testimony of the events of March 19 matched that of his partner. Stirgus further testified that Turner told them two people were involved. He gave the officers a description of the two perpetrators and stated that one of the perpetrators was named Wayne Foster, who lived somewhere around Constantinople Street.
Detective David Gaines was called to investigate the homicide at 1929 Delachaise Street. When Detective Gaines arrived on the scene, he observed cut and blood stained clothing at the entrance of the alley on the side of the house. The officer proceeded through the alley to the back of the house. On the back steps, he observed a nine-millimeter spent casing, keys and blood droppings. Entering the house from the rear, Gaines first observed a large amount of blood in the laundry room. As he proceeded to the next room, the officer saw a pool of blood near the entrance to the bedroom. On the floor, there was a spent nine-millimeter casing and a pair of broken eyeglasses. In the bedroom, the officer found two nine-millimeter casings on the bed, and another nine-millimeter casing by the closet. The victim, Arthur Booker, was lying on his back between the bed and the night table.
The front door of the residence had been nailed shut. The very front room was the living room. In the living room, Gaines observed that the window was open and the television was on. Gaines obtained the name of a possible perpetrator  Wayne Fosteralso learned that while two subjects were involved; there was only one shooter. After completing the crime scene investigation, the officer proceeded to Charity Hospital and interviewed Shedrick Turner, Steve Turner's brother.
Officer Gaines interviewed Steve Turner on March 21, 1995, at Charity Hospital. The officer obtained descriptions of the perpetrators and the name of the perpetrator who was not the shooter. Officer Gaines also interviewed the victim's father, Arthur Booker, Jr., and Jeffrey Cyprien's wife, Denise Cyprien. Mr. Booker provided the officer with information about a possible suspect. As a result, Gaines found Duane Sanford, who fit the description of Wayne Foster, and compiled a photographic lineup which included Duane Sanford. The officer also compiled photographic lineups which included Wayne Julien and Troy Allen. Officer Gaines showed these lineups to Steve Turner, who identified Duane Sanford as one of the perpetrators. The officer later obtained additional information and the name of "Curtis". The officer compiled a photographic lineup which included Curtis Harris and showed the lineup to Steve Turner. Turner identified Harris as the shooter.
Officer Joseph Waguespack assisted in the homicide investigation. He went to Charity Hospital and interviewed the victims. Officer Waguespack also took the victims' clothing into custody. At trial, the officer identified Cyprien's clothing. Waguespack interviewed Steve Turner who gave him a description of the two perpetrators. Steve also gave the officer the name of one of the perpetrators, but did not indicate which subject was the shooter. Steve did say that there was only one shooter.
Officer Edward Delery of the New Orleans Police Department Crime Laboratory processed the crime scene. He made drawings of the crime scene and house. Officer Isidro Maganna took photographs of the crime scene and collected evidence. The officer seized two small pieces of rock cocaine, spent casing, keys, a single razor blade, a crack pipe with residue, a piece of cotton with residue, a wire filter with residue, *1001 a piece of plastic with residue, blood samples, and several items of clothing.
Officer Kenneth Leary, a firearms examiner with the Crime Lab, examined seven nine-millimeter casings recovered from the crime scene. The officer also examined a nine-millimeter bullet, two ninemillimeter bullet jackets, two jacket fragments of unknown caliber and six lead fragments of unknown caliber recovered during the victim's autopsy. The officer was able to determine that a nine-millimeter semiautomatic pistol was used in the shooting. Officer Leary also determined that bullet and bullet fragments recovered from the autopsy were all fired from the same weapon. The officer further concluded that the seven casings found on the scene all came from the same weapon.
Dr. William P. Newman, III, a forensic pathologist with the Orleans Parish Coroner's Office, performed an autopsy on the victim on March 20, 1995. The victim suffered three gunshot wounds to the head that resulted in his death. Chemical analysis of the victim's bodily fluids revealed the presence of alcohol, marijuana and cocaine.
Arthur Booker, Jr., testified that his son, Arthur Booker, III, left home in the early evening hours of March 19, 1995, with Jeffery Cyprien. Later that evening, he learned his son had been killed. Mr. Booker stated that he received information about the incident from several people and relayed the information to the police.
Duane Sanford was indicted with Curtis Harris for the murder of Arthur Booker. Sanford pled guilty to manslaughter and executed a memorandum of understanding with the State in which he agreed to testify truthfully at trial. In the early evening hours of March 19, 1995, Sanford was selling drugs on Louisiana Avenue. Sanford testified he sold three pieces of crack cocaine to Steve Turner. Turner was with two other men. After the sale to Turner, Sanford went back to the corner and continued to sell drugs until later that night. After he finished selling drugs, Sanford walked to Turner's house. He was sitting on the back steps of Turner's house getting ready to shoot heroin when the defendant walked down the alleyway. The defendant asked if Steve was home. Sanford stated that he did not know. The defendant told Sanford to knock on the door. Sanford did not want to knock because he did not have anything to give Steve. Steve required anyone entering his house to give him a rock of cocaine before they could enter. Sanford knocked on the door. Steve asked who was knocking. Sanford stated that it was he. Steve opened the door. The defendant entered behind Steve. As the defendant entered the house, Sanford saw that the defendant had a gun; Sanford stayed on the steps. When he heard the gunshots, Sanford ran home. Sanford identified the defendant at trial. Sanford also acknowledged a prior conviction for armed robbery.
He gave Detective Gaines the names of "Curtis", "Wayne" and "Troy Allen."
Robert Jenkins, Sanford's attorney, testified as to the plea bargain Sanford entered into with the State.

III. DISCUSSION

A. Errors Patent
A review of the record for errors patent reveals none.

B. Assignment of Error No.1
In this assignment, the defendant contends that the state failed to produce sufficient evidence to sustain his conviction for manslaughter. The defendant was charged with first degree murder. The jury returned a compromise responsive verdict of manslaughter, as allowed under La.C.Cr.P. Art. 814. If the evidence adduced at trial was sufficient to support a conviction of the charged offense, the jury's verdict is authorized. State v. Holland, 544 So.2d 461 (La.App. *1002 2d Cir.1989), writ denied, 567 So.2d 93 (La.1990).
When assessing the sufficiency of evidence to support a conviction, the appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Jacobs, 504 So.2d 817 (La.1987).
In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. La. R.S. 15:438 is not a separate test from Jackson v. Virginia, supra, but rather is an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La.1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, supra.
First degree murder is the killing of a human being when the offender has the specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of an armed robbery or when the offender has the specific intent to kill or inflict great bodily harm upon more than one person. La. R.S. 14:30.
In the present case, the evidence supports the charge of first degree murder. The defendant was identified by two witnesses as the person who shot three people, one of whom was killed. The murder victim, Arthur Booker, was shot three times in the head. Dr. Newman testified that Booker died as a result of the gunshot wounds to the head. Jeffery Cyprien was shot in the leg and neck. When the officers found Cyprien, he was gasping for air. The wound to the neck was serious and could have been fatal. Steve Turner was shot in the arm. Turner's testimony indicates that the defendant attempted to shoot him more times but the defendant's weapon misfired. Testimony from one of the victims, Jeffrey Cyprien, indicates that the motive may have been robbery. Cyprien gave the defendant his driver's license and the cash he had with him.
Such evidence is sufficient to sustain a conviction for first degree murder. Thus, it is sufficient to sustain the compromise verdict of manslaughter.
This assignment is without merit.

C. Assignment of Error No.2
The defendant further argues that the trial court erred when it denied defendant's request for a mistrial after the State elicited inadmissible other crimes evidence.
The testimony of which the defendant complains occurred during the State's examination of Detective Gaines. The officer was testifying concerning the photographic lineup of Curtis Harris. The prosecutor asked the officer how he obtained the defendant's photograph. The officer stated that he obtained the defendant's photograph through the Print Track Profile computer. The prosecutor then asked "And what did you type into the Print Track Profile computer?" The officer answered "Bureau of Identification number, which is assigned each time a person is arrested." The defendant objected, and the court sustained the objection. Thereafter, the defendant requested a mistrial that was denied by the trial court. (Trial transcript, pp. 152-153).
The defendant argues that the statement by the officer was inadmissible other crimes evidence. La. C.E. article 404 provides that evidence of other crimes, acts or wrongs is generally not admissible. *1003 When a witness refers directly or indirectly to another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible, upon request of the defendant, the defendant's remedy is a request for an admonition or a mistrial pursuant to La.C.Cr.P. art. 771. The remark or comment must constitute an unambiguous reference to other crimes. State v. Lewis, 95-0769, p. 7 (La.App. 4 Cir. 1/10/97), 687 So.2d 1056, 1060, writ denied, 97-0328 (La.6/30/97), 696 So.2d 1004. On request, the trial court shall admonish the jury to disregard such remark or comment. La.C.Cr.P. art. 771. Upon motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant of a fair trial. Id. The granting of a mistrial under La.C.Cr.P. art. 771 is at the discretion of the trial court and should be granted only where the prejudicial remarks of the witness make it impossible for the defendant to obtain a fair trial. State v. Smith, 418 So.2d 515, 522 (La.1982); State v. Allen, 94-1895, p. 9 (La.App. 4 Cir. 9/15/95), 661 So.2d 1078, 1085, writs denied, 95-2557, 95-2475, (La.2/2/96), 666 So.2d 1087. Mistrial is a drastic remedy which is only authorized where substantial prejudice will otherwise result to the defendant. The determination of whether prejudice has resulted lies within the sound discretion of the trial court. Id. A trial court's ruling on whether or not to grant a mistrial for a comment by a police officer referring to other crimes evidence should not be disturbed absent a clear abuse of discretion. State v. Manuel, 94-0087, 94-0088, p. 4 (La.App. 4 Cir. 11/30/94), 646 So.2d 489, 491.
In the present case, the officer's answer was an ambiguous comment not directly related to a particular offense. The statement at best could be the basis of an inference of another crime. It did not directly refer to another crime. Further, the Louisiana Supreme Court and this court have held that reference to "mug shots," "booking photos" or Bureau of Identification ("B of I") photographs would not require the granting of a mistrial under Article 770. See State v. Curry, 390 So.2d 506 (La.1980); State v. Harris, 258 La. 720, 247 So.2d 847 (1971); State v. Livas, 527 So.2d 398 (La.App. 4th Cir. 1988). Additionally, "(n)o inference that an accused is a bad person can be drawn simply from the fact that the police had, or were able to procure, his photograph," State v. Youngblood, 325 So.2d 250, 251 (La.1975). Since admission of these photographs was not prejudicial, a mistrial was not mandated under Article 770 by an indirect reference to the source of the photos. Thus, the indirect reference to the source of the photographs was harmless; the guilty verdict cannot be attributable to this error. Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). The testimony of Steve Turner and Duane Sanford identified the defendant as the person who entered Turner's house and shot the victim, Cyprien and Turner. Turner and Cyprien testified as to the gunshot wounds they sustained during the shooting. Dr. Newman testified that the defendant sustained three gunshot wounds to the head that resulted in his death. Such evidence was sufficient to prove the defendant's guilt beyond a reasonable doubt. It is clear that a reference to police files as the source of the defendant's photograph did not contribute to the verdict and thus was harmless error.
This assignment is without merit.
Accordingly, the defendant's conviction and sentence are affirmed.
AFFIRMED.