MICHAEL E. KIRBY, Judge.

STATEMENT OF CASE

The Orleans Parish Grand Jury indicted Brandon Ruffin for two counts of second- *501 degree murder (La. R.S 14:30.1) relative to the deaths of Denzel Williams on June 19, 2008 (count 1) and Kenneth Davis on January 29, 2009 (count 2).
Mr. Ruffin pled not guilty at his arraignment and thereafter filed motions to suppress the evidence, statement and identification, which the trial court ultimately denied.
Also, the trial court denied defendant’s motion to sever the offenses, and he unsuccessfully sought supervisory review of that ruling with this Court. State v. Ruffin, unpub., 2010-0866 (La.App. 4 Cir. 6/21/10). The Supreme Court also denied relief. State v. Ruffin, 2010-1467 (La.6/25/10), 89 So.3d 582.
Following the trial, the jury convicted Mr. Ruffin of manslaughter as to count 1, and found him guilty as charged on count 2.
The trial court denied his motions for new trial and for post-verdict judgment of acquittal and sentenced him to thirty-five years without benefit of probation, parole or suspension of sentence, with credit for time served, on count one. For count two, the court imposed a sentence of life imprisonment without | ¡.benefit of probation, parole or suspension of sentence with credit for time served. The sentences are to be served concurrently with one another and with any other sentence the defendant is serving. This timely appeal follows.

STATEMENT OF FACT

Ms. Gizelle Roussel, Assistant NOPD Communications Supervisor, who supervises the 911 operators and dispatchers and is the custodian of 911 records, identified State’s Exhibits 1 and 2. They were the incident recall and cassette tape, respectively, for Police Item No. F 240-90-08, records of the 911 call regarding the homicide of Denzel Williams at 1708 Hero Street. The tape recording of the call was played for the jury as it followed on a transcribed copy.
NOPD Detective Greg Hamilton was the lead investigator on the Denzel Williams homicide. At the scene he observed the victim’s body lying in the front yard of the residence. He confirmed that State’s exhibits 3A through AZ were pictures of the crime scene, including photos of the victim’s body wounds, gun[1], cigarette lighter, knife, cigarette butts and the hand held portion of a telephone. Hamilton’s investigation entailed speaking with the defendant and his mother, Ms. Kecie Anear. During a conversation between Hamilton, Ms. Anear and defendant, the defendant told Hamilton that he was at the scene of the homicide, but that he had nothing to do with it. The defendant said that as he and the victim were speaking, some black males came from the side of the building and began firing at the victim, at which time the defendant ran away. Following that meeting, the |3police allowed defendant to leave the police station and travel out of town, after he provided contact information, because Ms. Anear feared for his safety.
Hamilton videotaped his second conversation [2] with defendant. In this statement, the defendant said that the victim robbed him of a cigarette and held a gun on him, and that that was why he shot the victim.
*502 In a statement with Hamilton on February 2, 2009[3], defendant changed his story, telling Hamilton that he shot the victim because Williams pulled a gun and robbed him of $50.00. Ruffin claimed self-defense, but, Hamilton had noted immediately after the shooting that the victim had no money on his person.
Further, Hamilton spoke with defendant again on October 2, 2009, after learning he was under investigation for another crime. Prior to this interview defendant had spoken with Detective Frankie Watts, and it was that discussion that prompted Hamilton to conduct yet another interview. The Watts interview revealed discrepancies with the story Ruffin told Hamilton in their second conversation. Hamilton arrested the defendant that day.
Hamilton identified State’s Exhibits 10, 11, 12 and 13 as crime scene photographs of a Bic lighter, a pocket knife, .38 caliber bullets and the gun removed from the victim’s pocket, respectively.
Under cross-examination, Hamilton said the victim’s father told him that the victim was known in the community as a dangerous/violent person who carried a gun. However, Hamilton noted that the defendant had no criminal record prior to this homicide.
| ,tJohn Gaggliano, the chief investigator for the Coroner’s Office on this homicide, explained that his job entailed investigating homicides and relating his findings to a pathologist. He gathers items from a victim, describes the scene and confiscates any weapons, which he then transfers to the Police Crime Lab. When Gaggliano arrived at the Denzel Williams shooting scene the victim was lying on the porch of the residence. He photographed the scene, examined the victim’s body for wounds, and removed a gun from the victim’s right front pants pocket.
Detective Frankie Watts participated in defendant’s arrest. He received information that defendant was in custody in Jefferson Parish on another charge. Watts had defendant released to his custody for transfer to the NOPD homicide division. Watts identified State’s Exhibit 14 as the video recording of the statement he took from the defendant and State’s Exhibit 15, the transcript. The State played Exhibit 14 for the jury.
During cross-examination, Watts told the jury that when he took the statement, defendant was under arrest for the murder of Kenneth Davis.
Dr. Paul McGary testified by stipulation as an expert in forensic pathology. Dr. McGary performed the autopsy on the body of Denzel Williams and identified State’s Exhibit 16 as the report of his findings. The victim suffered three gunshot wounds — one in the right upper chest, one to the right buttock and a third to the left side of the head. Mr. Williams died from injuries to his brain, right lung, liver, diaphragm, and inferior vena cava. The wounds destroyed tissue and caused massive internal hemorrhage. The doctor opined that the chest wound was delivered by an assailant standing above the victim and shooting down into him, or the victim could have been bending forward, toward the shooter. The buttock wound could have occurred as the victim was moving or falling forward or running | Baway from the shooter. As for the head wound, Dr. McGary concluded that the muzzle of the gun was about two and a half inches away when the kill shot was delivered. Dr. McGary opined that the victim would not *503 have been able to put his gun back in his pocket after being shot.
Dr. Samantha Huber testified by stipulation as an expert in forensic pathology. She explained the autopsy procedure and stated that she performed the autopsy on the body of Kenneth Davis. She documented her findings in the report identified as State’s Exhibit 17. Dr. Huber identified State’s Exhibit 18 as her diagram of the victim’s wounds. The victim had two minor abrasive injuries — one to his right middle finger and another to his right cheek. He also sustained two major gunshot wounds — a fatal wound to the left back of the head and a wound to the left shoulder. Dr. Huber said State’s Exhibit 19 was the crime lab envelope containing the bullet retrieved from Mr. Davis’ third thoracic vertebrae. She opined that the bullet entered his head from the left back.
Ms. Kathy Robertson, another employee of the NOPD 911 Communications Center, authenticated State’s Exhibit 21 as the transcription of the incident recall of the 911 report pertaining to the Davis homicide and State’s Exhibit 22 as a copy of the audiotape of the 911 call of 7:30 p.m. on January 29, 2009.[4] Both exhibits bear No. A 33759-09, linking them to this case.
The next witness was NOPD crime scene technician Dianca Johnson, who investigated the Kenneth Davis shooting scene. She identified State’s Exhibit 22 as her crime scene report and State’s Exhibit 23-A through 23-AD as a series of photographs she took of the scene. When she arrived she located Kenneth Davis’ [(¡body on the back porch of the residence. Among the pictures Ms. Johnson took is one of the gunshot wound to the back of the victim’s head.
NOPD Homicide Detective Scott Ro-drigue responded to the shooting. Upon arrival he obtained the victim’s name, and entered the residence. He encountered Detective Nicholas Gernon who was preparing to transport three female witnesses to headquarters for interviews. Rodrigue identified State’s Exhibits 30 and 31 as pictures of a Pepsi can and cellular phone, respectively, retrieved from under the victim’s body. Rodrigue’s investigation developed the defendant as a suspect.
The day after the shooting, Rodrigue went to defendant’s mother’s house to speak with him. After identifying himself and the purpose of his visit, Rodrigue requested that the defendant answer some questions at headquarters. He informed the defendant that he was not under arrest, and defendant voluntarily accompanied Rodrigue. The detective identified State’s Exhibit 32, the recording of Ruf-fin’s videotaped statement of January 29, 2009, which was subsequently played for the jury. After taking the statement, Ro-drigue returned defendant to his mother’s house.
Rodrigue attended the Davis autopsy and learned that the victim sustained a fatal gunshot wound to the back of the head. Rodrigue noted that the victim’s wound did not match defendant’s statement that he shot Davis as he (the defendant) was running away from Davis. This version of what happened would have caused a wound to the side of Mr. Davis head, not the back. Based on the discrepancies in defendant’s statement, Rodrigue obtained a warrant for his arrest on a charge of second-degree murder and a search warrant for Ms. Ancar’s residence. The search yielded several photographs, a dark colored hat and two loaded firearms — a .357 handgun and a .38 special.
|7Sgt. Byron Winbush, an expert firearms examiner with the NOPD, conducted *504 a firearms analysis to determine which of the two guns seized at defendant’s residence killed Kenneth Davis. Winbush examined a .357 caliber Smith and Wesson blue steel revolver and a .88 caliber Taurus steel revolver. He compared the bullet retrieved during the victim’s autopsy with the two revolvers and determined that the Taurus revolver fired it.
The State recalled Detective Watts concerning his February 2, 2009 taped conversation with defendant referencing the shooting death of Kenneth Davis. Watts identified State’s Exhibit 41, the video recording of that conversation, which the State played for the jury. In the statement, defendant says that the victim called him and said he wanted to make peace. Defendant believed that the victim had fired a gun at him earlier.
Ms. Harrineasha Jackson testified that she and Kenneth Davis had been dating two years and living together for five months at the time of his death. The day Mr. Davis died, Ms. Jackson was at school and learned of the shooting in a telephone call from her sister. When she arrived home, the police were there and she found Mr. Davis lying on the back porch. About a week before his death, Davis told her that he and defendant were involved in a shootout and that the defendant wanted to kill him. Between the time of that shootout and Mr. Davis’ death, defendant appeared at her residence twice. The first time, Mr. Davis was not at home, and defendant asked her for his cell phone number. The second time, the victim was at home. Ms. Jackson answered the door to find defendant, armed with a big gun, and a friend in tow. Davis stepped outside and purchased pills from the defendant’s friend.
|sOn cross-examination, Ms. Jackson said that even though Mr. Davis had said that defendant wanted to kill him, he was not afraid.
Defense witness Ms. Doris Anear, defendant’s grandmother, said that her only contact with Detective Hamilton was the day of the shooting on Hero Street. Ms. Anear asked Hamilton to speak with her and defendant’s mother at her house. At that meeting, Hamilton gave Ms. Anear his telephone number in case she heard from defendant.
On the night Kenneth Davis was killed Ms. Davis’ grandson called her to drive him to his house. As she drove him to his residence they were followed by two men in a truck. She believed the men were policemen.
Ms. Kecie Anear, defendant’s mother, told the jury that defendant lived at home, and that he and Denzel Williams were childhood friends in the Fisher Housing Development. Ms. Anear said that Denzel Williams had a violent/dangerous reputation, and that she heard he was responsible for several killings. She sent her son out of town because she feared for his safety. On cross-examination, Ms. Anear denied that Ruffin had a bad reputation or that he used drugs or possessed guns.

ERRORS PATENT/ASSIGNMENT OF ERROR NUMBER 6

A review for errors patent reveals one, an illegal sentence. The issue is also raised as the defendant’s sixth assignment of error.
The trial judge imposed an illegal sentence as to count 1 (manslaughter) by denying the defendant parole eligibility, when La. R.S. 14:31 makes no such restriction.
|fl“An illegal sentence may be corrected at any time by the court that imposed the sentence or by an appellate court on review.” La. C. Cr. P. art. 882(A). Consequently, pursuant to La.C.Cr. P. art. 882, *505 we amend the defendant’s sentence to delete the denial of parole eligibility and instruct the trial court to make a minute entry and issue a new commitment form reflecting this change.

ASSIGNMENT OF ERROR NUMBER 1

Defendant’s first assignment claims the trial court erred in denying his Motion to Sever and Motion for New Trial. The refusal to sever the offenses, he asserts, denied him a fair trial. He claims prejudice because: the jury improperly concluded he had a criminal disposition; his defense was hampered by the joinder; the prosecutor’s closing statement unjustly maligned him as a “thug” and “double murderer”; and the court failed to properly charge the jury that it was to consider the offenses separately.
Although defendant notes that the denial of severance was presented to this Court and the Louisiana Supreme Court for supervisory review,[5] the State concedes that the pretrial denial of supervisory writs does not preclude us from considering this argument on appeal. State v. Davis, 2009-0438 (La.App. 4 Cir. 1/13/10), 30 So.3d 201, 207-208.
C.Cr.P. art. 493 provides:
Joinder of offenses
Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or | inmisdemeanors, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan; provided that the offenses joined must be triable by the same mode of trial.
While La.C.Cr.P. art. 495.1 provides:
Severance of offenses
If it appears that a defendant or the state is prejudiced by a joinder of offenses in an indictment or bill of information or by such joinder for trial together, the court may order separate trials, grant a severance of offenses, or provide whatever other relief justice requires.
In ruling on a motion to sever, the trial court must weigh the possibility of prejudice to the defendant against the important considerations of economical and expedient use of judicial resources. In determining whether joinder will be prejudicial, the court should consider: (1) whether the jury would be confused by the various counts; (2) whether the jury would be able to segregate the various charges and evidence; (3) whether the defendant would be confounded in presenting his various defenses; (4) whether the crimes charged would be used by the jury to infer a criminal disposition; and (5) whether, especially considering the nature of the charges, the charging of several crimes would make the jury hostile. State v. Deruise, 1998-0541, p. 8 (La.4/3/01), 802 So.2d 1224; State v. Brooks, 541 So.2d 801 (La.1989).
There is no prejudicial effect from the joinder of two offenses when the evidence of each is relatively simple and distinct, so that the jury can easily keep the evidence of each offense separate in its deliberations. State v. Denise, supra; State v. Brooks, supra.
*506 Whether justice requires a severance must be determined by the facts of each case. State v. Prudholm, 446 So.2d 729, 741 (La.1984).
|nA defendant is not entitled to a severance as a matter of right. Prudholm, 446 So.2d at 741. The decision to grant a severance is one resting within the sound discretion of the trial court and based upon a showing of clear prejudice. State v. Washington, 886 So.2d 1368, 1371. Moreover, a denial of a motion to sever will not be overturned on appeal absent a clear abuse of discretion. Prudholm, 446 So.2d at 741.
A review of the record in this case in light of first two criteria of State v. Washington shows that the facts of each offense were simple and uncomplicated. Two people were killed; the killer confessed; and the only question facing the jury was justification. The murders were presented in chronological order and were similar in nature in that the defendant shot both victims in the back of the head. While the two offenses share enough similarities to make joinder permissible, the facts of each offense are not identical and are easily distinguishable from each other. See, State v. Deruise, 98-0541 (La.4/3/01), 802 So.2d 1224, 1232. There was little likelihood that the jury was confused by the State’s presenting evidence of the crimes together in one trial.
Continuing, as to the third Washington factor — whether the defendant was confounded in the presentation of defenses— the defendant has not shown how his defenses were compromised by the joint trial.
As for the fourth and fifth Washington factors — inference of a criminal disposition and possible jury hostility — the jury in this case returned a verdict of guilty as charged on count 2 (Kenneth Davis) and guilty of a lesser charge on count 1 (Den-zel Williams). The verdicts suggest that the jurors knew to evaluate each count independently and, in fact, did so. Moreover, the verdicts returned do not | ^indicate that the jurors were influenced by a belief that the defendant possessed a criminal disposition.
Considering the simplicity of the facts of the offenses, the orderly presentation of evidence, the witnesses’ testimony and defendant’s confession as the perpetrator, we find the jury was not confused by the joinder nor was there any prejudice to the defendant. Significantly, defendant offered no evidence that the joinder of the offenses hindered his right to present a defense.
As additional support for his severance argument, Ruffin reports statements purportedly made by two jurors in post-trial interviews to the effect that “during deliberations, jurors went back and forth between the two murders and that it was ‘overwhelming having both cases at one time,’ ” and that “the defense case ‘was lost from the beginning’ because ‘it was two dead.’ ” However, this argument has no merit, as the “purported” statement made by a juror is not competent evidence for purposes of a new trial.
La. C.E. art. 606(B) provides:
Inquiry into validity of verdict or indictment.
Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury’s deliberations or to the effect of anything upon his or any other juror’s mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question *507 whether any outside influence was improperly brought to bear upon any juror, and, in criminal cases only, whether extraneous prejudicial information was improperly brought to the jury’s attention. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.
[ lsLouisiana subscribes to the common law rule, incorporated in La. C.E. art. 606(B), that jurors may not impeach their verdict by evidence of their own misconduct. The rule[6] incorporates important systemic values, including the finality of judgments, and allows only narrow exceptions for outside influences or extraneous prejudicial information. State v. Ingram, 2010-2274, p. 7 (La.3/25/11), 57 So.3d 299 citing Tanner v. United States, 483 U.S. 107, 119, 107 S.Ct. 2739, 2747, 97 L.Ed.2d 90 (1987).
Consequently, defendant’s reference to the contents of post-trial interviews with jurors consisting of “matter[s] ... occurring during the course of the jury’s deliberations” and “the effect of anything upon his or any other juror’s mind or emotions” and “as influencing him to assent to or dissent from the verdict or indictment” are barred from consideration by La. C.E. art. 606(B).
Ruffin also complains that he was prejudiced by the State’s closing argument that “... [it] has proven beyond a reasonable doubt that [the defendant] is a thug, a double murderer” and the statements about “execution-style killings” and “... that’s what [the defendant] does. He shows up. People turn around and he shoots them in the back as a cold blooded murderer.”
In State v. Clark, 2001-2087, p. 15 (La.App. 4 Cir. 9/25/02), 828 So.2d 1173, 1183, this Court set forth the standard for determining whether a prosecutor’s remarks are so prejudicial as to warrant a new trial:
The scope of closing argument “shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case. The argument shall not appeal to prejudice. The state’s 114rebuttal shall be confined to answering the argument of the defendant.” La.C.Cr.P. art. 774. Prosecutors may not resort to personal experience or turn argument into a plebiscite on crime. State v. Williams, 96-1023, p. 15 (La.1/21/98), 708 So.2d 703, 716. However, prosecutors have wide latitude in choosing closing argument tactics. State v. Casey, 99-0023, p. 17 (La.1/26/00), 775 So.2d 1022, 1036, citing State v. Martin, 539 So.2d 1235, 1240 (La.1989) (closing arguments that referred to “smoke screen” tactics and defense as “commie pinkos” were deemed inarticulate but not improper). Further, the trial judge has broad discretion in controlling the scope of closing arguments. Id. Even if the prosecutor exceeds the bounds of proper argument, a reviewing court will not reverse a conviction unless “thoroughly convinced” that the argument influenced the jury and contributed to the verdict. State v. Ricard, 98-2278, p. 4 (La.App. 4 Cir. 1/19/00), 751 So.2d 393, 397. Even *508 where the prosecutor’s statements are improper, credit should be accorded to the good sense and fairmindedness of the jurors who have heard the evidence. Williams, supra; Ricard, supra.
As for the objection to the use of the word “thug” in the State’s closing argument, considering that the State proved that the defendant was guilty of murder, a violent offense, and the dictionary defines the word “thug” as an “aggressive and violent young criminal”, there is nothing inappropriate in the use of the term. It is evident in today’s culture that the term is widely used in song lyrics, every day conversation, street slang and the print media. Moreover, when the prosecutor referred to the defendant as a “double murderer”, he was simply restating the allegations of the indictment.
A review of the closing argument indicates that the prosecutor focused on the two crimes in separate order, and during second rebuttal closing argument, the prosecutor emphasized the inconsistencies in the defendant’s statements concerning the two murders. The judge instructed the jury that closing arguments are not evidence. The fact that the jury returned a non-unanimous verdict of | ^manslaughter and a unanimous second-degree murder conviction definitively indicates that the defendant’s convictions were based solely upon the evidence.
Defendant has failed to prove prejudice from the non-severance of the offenses and that the trial court erred in denying his Motion for New Trial. This assignment of error is meritless.

ASSIGNMENT OF ERROR NUMBER 2

By this assignment, defendant argues that the trial judge erred by denying his Motion for Mistrial under La.C.Cr.P. art. 771.[7]
Specifically, defendant complains that Detective Hamilton, in violation of a motion in limine, stated that during the course of the Denzel Williams investigation, the defendant was “wanted” on an outstanding warrant. The defense objected; the objection was sustained. Defendant then moved for a mistrial, which was denied. In addition to Detective Hamilton’s testimony, the State played a portion his interview with the defendant. A segment of the interview was redacted by use of the “fast-forward” feature and defendant contends this prejudiced him by drawing additional attention to Hamilton’s remark that defendant was “wanted.”
I,(¡Except under certain statutory or jurisprudential exceptions, evidence of other crimes or bad acts committed by the defendant are not admissible at trial. La. C.E. art. 404(B)(1). In State v. Sartain, 98-0378 (La.App. 4 Cir. 12/1/99), 746 So.2d 837, 845, this Court reviewed the relevant jurisprudence as follows:
*509 When a witness refers directly or indirectly to another crime committed or alleged to have been committed by the defendant, as to which evidence is not admissible, the defendant’s remedy is a request for an admonition or a mistrial pursuant to LSA-C.Cr.P. art. 771. The remark or comment must constitute an unambiguous reference to other crimes. State v. Lewis, 95-0769, p. 7 (La.App. 4 Cir. 1/10/97), 687 So.2d 1056, 1060, writ denied, 97-0328 (La.6/30/97), 696 So.2d 1004. On request, the trial court shall admonish the jury to disregard such remark or comment. La. C.Cr.P. art. 771. Upon motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant of a fair trial. Id. The granting of a mistrial under La.C.Cr.P. art. 771 is at the discretion of the trial court and should be granted only where the prejudicial remarks of the witness make it impossible for the defendant to obtain a fair trial. State v. Smith, 418 So.2d 515, 522 (La.1982); State v. Allen, 94-1895, p. 9 (La.App. 4 Cir. 9/15/95), 661 So.2d 1078, 1085, writs denied, 95-2557, 95-2475, (La.2/2/96), 666 So.2d 1087. Mistrial is a drastic remedy that is only authorized where substantial prejudice will otherwise result to the defendant. Id. The determination of whether prejudice has resulted lies within the sound discretion of the trial court. State v. Banks, 96-2227, p. 2 (La.4/18/97), 692 So.2d 1051, 1053. A trial court’s ruling on whether or not to grant a mistrial because of comments by a police officer referring to other crimes evidence should not be disturbed absent a clear abuse of discretion. State v. Nicholson, 96-2110, p. 13 (La.App. 4 Cir. 11/26/97), 703 So.2d 173, 180, writ denied, 98-0014 (La.5/1/98), 805 So.2d 200; State v. Manuel, 94-0087, 94-0088, p. 4 (La.App. 4 Cir. 11/30/94), 646 So.2d 489, 491. “Errors are harmless unless the reviewing court is thoroughly convinced that the remarks inflamed the jury and contributed to the verdict.” State v. Nicholson, supra, citing State v. Byrne, 483 So.2d 564 (La.1986), cert. denied, Byrne v. Louisiana, 479 U.S. 871, 107 S.Ct. 243, 93 L.Ed.2d 168 (1986). (emphasis supplied).
|17M at pp. 10-11, 746 So.2d at 845-846.
There is no error in the denial of the defendant’s motion for mistrial because the reference to the defendant’s status as “wanted” is not an unambiguous reference to a prior crime. While testifying, Detective Hamilton made it clear on three occasions that the defendant had no prior criminal history and that he thought the defendant was a “pretty good kid.”
In State v. Adams, 2007-0977 (La.App. 4 Cir. 1/23/08), 976 So.2d 757, the defendant was arrested for public intoxication, and at trial the following exchange occurred during cross-examination:
Q. You arrest people for urinating in public instead of giving them a citation? A. Depending on a history of warrants or—
Q. I didn’t ask you that. The question was, do you — in this particular case, you decided not to give a citation, but just arrest him.
A. Well, my partner had placed him under arrest due to the fact that he didn’t have any ID on him. Like I say, coupled with the fact of having a history of warrants.
Following this exchange, the defense moved for a mistrial in the judge’s chambers because there was no mention of a history of arrest warrants in the police report and because the officer’s testimony made appellant look like an evildoer. This Court ruled that there was no error, in *510 part, because “[W]e cannot say that [the officer’s] testimony was an unambiguous reference to other crimes.” Id. at 760.
Likewise, in State v. Harris, 97-2903 (La.App. 4 Cir. 9/1/99), 742 So.2d 997, this Court considered the following situation:
The testimony of which the defendant complains occurred during the State’s examination of Detective Gaines. The officer was testifying concerning the photographic lineup of Curtis Harris. The prosecutor | TSasked the officer how he obtained the defendant’s photograph. The officer stated that he obtained the defendant’s photograph through the Print Track Profile computer. The prosecutor then asked “And what did you type into the Print Track Profile computer?” The officer answered “Bureau of Identification number, which is assigned each time a person is arrested.” The defendant objected, and the court sustained the objection. Thereafter, the defendant requested a mistrial that was denied by the trial court.
Id., 742 So.2d at 1002.
Finding no error in the denial of mistrial, the court reasoned that “the officer’s answer was an ambiguous comment not directly related to a particular offense. The statement at best could be the basis of an inference of another crime. It did not directly refer to another crime.” Id. 742 So.2d at 1003.
In this case, Detective Hamilton’s statement that the defendant was “wanted” “at best could be the basis of an inference of another crime,” Harris, supra, and is no more prejudicial than the statement in Adams, supra, that the defendant had “a history of outstanding arrest warrants.” This assignment is without merit.

ASSIGNMENT OF ERROR NUMBER 3

In a third assignment, defendant contends that the trial judge erred by admitting “other crimes” evidence during trial because the State did not provide timely notice of its intent to use the evidence.
This dispute requires some procedural background information. Prior to Ms. Harrineasha Jackson’s testimony, during a conference in the judge’s chambers, the prosecutor notified the court and the defense that the State intended to elicit testimony from Ms. Jackson that defendant, within a week of the shooting, arrived | )9at her doorstep with a gun looking for Mr. Davis. The defense objected, claiming that it should have received notice pursuant to C.E. art. 404(B)[8].
After reviewing Ms. Jackson’s statement to the police[9], the trial judge found the evidence admissible because the defendant raised the issue of self-defense, and testimony that defendant was armed when he went to Ms. Jackson’s home was pertinent.
During trial, Ms. Jackson testified:
*511 The second time he [the defendant] showed up, Lil’Kenneth was home that time. And Brandon knocked on my back door and he had another boy with him, and Brandon had a gun with, like, a big gun. He had a gun with him. And he asked Lil’Kenneth did he want to buy some pills or something, something like that.
We must note that defendant has failed to preserve this issue for appellate review. While the record reflects that the defendant objected to this testimony in chambers, it does not indicate a corresponding objection during trial, nor is the issue listed in the motion for new trial. Consequently, under the contemporaneous objection rule, (La.C.Cr. P. art. 841) the issue is not preserved for appellate review.
Nevertheless, the trial court’s ruling is incorrect.
The record indicates that the defense requested notice of the State’s intent to introduce “other crimes” evidence in June 2009. Yet, the record does not reflect 12pthat the prosecutor gave any written notification to the defense concerning the scope of Ms. Jackson’s testimony. Further, the defense claims it only learned what her testimony would be at the conference just prior to Ms. Jackson’s taking the stand to testify.
The State disputes defendant’s claim of no notice, stating that the prosecutor supplied the defense with a copy of Ms. Jackson’s statement to the police “prior” to trial. The defense was therefore aware of the contents of her testimony. Whether the State’s action constituted “reasonable notice” contemplated by C.E. art. 404(B) is questionable at best.
Even though the evidence was erroneously admitted, the erroneous admission of other crimes evidence is subject to harmless error analysis. See State v. Maise, 2000-1158, p. 14 (La.1/15/02), 805 So.2d 1141, 1151. Erroneous admission of evidence requires reversal only where there is a reasonable possibility that the evidence might have contributed to the verdict. State v. Casey, 99-28, p. 13 (La.1/26/00), 775 So.2d 1022, 1038, citing Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); State v. Gibson, 391 So.2d 421 (La.1980). The relevant inquiry is whether the reviewing court may conclude the error was harmless beyond a reasonable doubt ... i.e. was the guilty verdict actually rendered unattributable to the error. Id. In this case, the defendant’s confession that he shot both victims convicted him of second-degree murder and manslaughter, not “other crimes” evidence. This assignment has no merit.
| ^ASSIGNMENT OF ERROR NUMBER 4
The fourth assignment of error addresses the trial court’s refusal to exclude the 911 tape. Defendant maintains that the trial court erred because the tape was not supplied the defense until after trial began. Further, the defendant complains he was denied the right to impeach the 911 caller by use of her subsequent statement to police.
The caller on the 911 tape, Ms. Andrea Carter, indicates that she was an eyewitness to the shooting and named the defendant as the shooter. Ms. Carter was one of three young women in the living room of the apartment at the time of the shooting. Later, she gave the police a statement in which she admitted she did not actually see the shooting, but only assumed that the shadows she had seen outside were those of Kenneth Davis and defendant. She had no independent knowledge of what had occurred after the two had the left the apartment earlier in the evening. *512 Over the objection of the defense, the trial court admitted the 911 tape at trial.
La. C.E. art. 806 provides:
Attacking and supporting credibility of declarant
When a hearsay statement, ... has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if declarant had testified as a witness. Evidence of a statement or conduct by the declarant at any time, offered to attack the declarant’s credibility, is not subject to any requirement that he may have been afforded an opportunity to deny or explain. If the party against whom a hearsay statement has been admitted calls the declarant as a witness, the party is entitled to examine him on the statement as a witness identified with an adverse party.
|gaThe trial judge erred in her ruling. However, as with the “other crimes” issue addressed in the preceding assignment, the error, however, was harmless. The defendant confessed to having shot and killed the victims. The trial court’s refusal to allow the defense to impeach Ms. Carter did not contribute to the defendant’s convictions. See State v. Maise, 2000-1158, p. 14 (La.1/15/02), 805 So.2d 1141, 1151. This assignment has no merit.

ASSIGNMENT OF ERROR NUMBER 5

In this fifth assignment of error, defendant argues the trial judge erred by refusing to include his special charge, that the jury be instructed it was to consider the evidence on each count separately.
La.C.Cr.P. art. 802 requires the trial court to charge the jury as to the law applicable to the case. Under La. C.Cr.P. art. 807, a requested special jury charge shall be given by the court if it does not require qualification, limitation or explanation, and if it is wholly correct and pertinent. The special charge need not be given if it is included in the general charge or in another special charge to be given. State v. Segers, 355 So.2d 238, 244 (La.1978). Failure to give a requested jury instruction constitutes reversible error only when there is a miscarriage of justice, prejudice to the substantial rights of the accused, or a substantial violation of a constitutional or statutory right. State v. Morse, 365 So.2d 1319, 1322-24 (La.1978); La.C.Cr.P. art. 921.[10]
The defendant’s requested special charge in this case reads as follows:
| ;hA separate offense is charged in each of the two counts of the indictment which you are to consider. Each offense, and the evidence which applies to it, should be considered separately, and you should return a separate verdict as to each count. The fact that you may find the defendant guilty as charged, guilty of a responsive verdict or not guilty on any one count of the indictment should not control or influence your verdict in any way with respect to the other count of the indictment.
In response to defendant’s argument during the jury charge conference that the instruction “is not covered in any of the court’s other instructions,” the trial judge stated: “It is covered in the instruction. It’s just not covered — It’s just not stated the way you said. I instruct the jury that *513 they are to reach a decision. They are also to deliberate separately and they are to reach a verdict as to each count.”
Further, though not necessarily in the following order, the trial judge charged the jury in pertinent parts:
In this case the defendant is charged in count 1 with the second degree murder of Denzel Williams and in count 2 the second degree murder of Kenneth Davis.
The defendant is presumed to be innocent until each element of the crime necessary to constitute his guilt is proven beyond a reasonable doubt.
You must consider only evidence which was admitted during the trial. You may not consider evidence which you were instructed to disregard or to which an objection was sustained.
The opening statements and the closing arguments are not to be considered as evidence.
Remember, the accused is on trial only for the offense charged. You may not find him guilty of this offense merely because he may have committed another offense.
If the State has failed to prove beyond a reasonable doubt that the defendant is guilty of either the offenses charged or of a lesser responsive verdict, the form of your verdict should be not guilty.
124At least ten members of the jury must concur to reach a verdict in this case, on each count. A separate verdict is required for each count of the indictment.
A separate verdict is required for each count of the indictment.
The trial judge also instructed the jury: “You must not single out any of these instructions and disregard others. The order in which the instructions are given does not indicate that one instruction is more import than another.”
A review of the jury instructions in this case shows that the jury was made aware that: there were two separate counts; the State bore the burden of proving each element of each count; and the defendant could not be found guilty of one offense because the jury believes he is guilty of another offense.
By telling the defendant that his requested jury instruction “is covered ... just not stated the way you said,” the trial judge made a determination that the defendant’s requested instructions were substantially covered by the rest of the charge to the jury. See La.C.Cr.P. art. 806. This assignment is meritless.

ASSIGNMENT OF ERROR NUMBER 7

In a final assignment, defendant claims the trial judge erred by denying challenges for cause as to potential jurors Clara Brickley and Jennifer Williams, causing him to ultimately exhaust his peremptory challenges and thus denying him a fair trial.
La. Const, art. 1, § 17 provides that a criminal defendant has the right to challenge jurors peremptorily and that the number of challenges shall be fixed by law. In the trial of an offense punishable by death or necessarily by imprisonment at hard labor, the defendant and the state shall each have twelve peremptory | ^challenges. La.C.Cr.P. art. 799. Consequently, when a defendant uses all of his peremptory challenges, a trial court’s erroneous ruling which deprives him of one of his peremptory challenges constitutes a substantial violation of his constitutional and statutory rights. Prejudice is presumed and the conviction and sentence must be reversed. State v. Jacobs, 99-1659 p. 4 (La.6/29/01), 789 So.2d 1280, 1283.
*514 In order “to prove there has been reversible error warranting reversal of the conviction, defendant need show (1) the erroneous denial of a challenge for cause; and (2) the use of all of his peremptory challenges.” State v. Robertson, 92-2660 (La.1/14/94), 630 So.2d 1278, 1281. Moreover, the defendant must show that he objected at the time of the ruling to the court’s refusal to sustain a challenge for cause of the prospective juror. State v. Cross, 93-1189 p. 6 (La.6/30/95), 658 So.2d 683, 686.
The record shows the defendant objected timely to the trial court’s rulings and, in fact, exhausted his peremptory challenges. However, he cannot show that denial of his challenges for cause as to either Clara Brickley or Jennifer Williams is error.
Ruffin claims the trial court should have excused Clara Brickley because she stated that a family member had been the victim of a violent crime. Ms. Brickley explained that her thirteen-year old great-niece had been killed. When asked whether her niece’s death would affect her ability to sit on the jury, she responded “It may.” When questioned further, she told the prosecutor that, “I’m quite sure I’ll be emotional because I will have flashbacks, because I still have not gotten over that yet. And her killers have not been found.” The defendant argues that Ms. Brickley’s responses indicated her inability to be a rational and unbiased juror.
[gfiA trial court is vested with broad discretion in ruling on challenges for. cause, and these rulings will be reversed only when a review of the voir dire record as a whole reveals an abuse of discretion. State v. Campbell, 2006-0286, p. 73 (La.5/21/08), 983 So.2d 810, 858. This standard is utilized since the trial court has the benefit of seeing the facial expressions and hearing the vocal intonations of the members of the jury venire as they respond to questioning. State v. Kang, 2002-2812 (La.10/21/03), 859 So.2d 649. Such expressions and intonations are not readily apparent at the appellate level where a review is based on a cold record. Id.
In support of his position, defendant cites State v. Holmes, 619 So.2d 761 (La. App. 4 Cir.1993), where this Court held that a juror who indicated under intense and thorough questioning that she could not assure defense counsel that the fact that her husband had been held hostage at one point would not affect her in judging the accused. The juror had expressed similar sentiments under questioning by the State and the trial court. Under questioning by the trial court, however, the real issue came out. The accused was being tried for, inter alia, aggravated kidnapping. The juror’s husband had been taken hostage. Explaining her reservations, the juror expressly stated: “Kidnapping is why.” Holmes, 619 So.2d at 763.
In this case, unlike State v. Holmes, supra, Ms. Brickley did not say unequivocally that her grand-niece’s death would prevent her from being an impartial juror. Further, Ms. Brickley merely stated that she might be emotional because of violent crime, but she did not indicate that her emotional state would have an adverse effect upon her deliberation as to the defendant’s guilt.
This case is closely aligned with State v. Robinson, 2008-0652 (La.App. 4 Cir. 5/13/09), 11 So.3d 613, wherein the prospective jurors were asked by the State 127during voir dire whether any of them had a family member or friend who had been a victim of violent crime. Prospective juror Mielke responded:
Well, my son was robbed and pistol-whipped about four years ago, my youn *515 ger daughter was attempted car-jacked about two years before that, and my oldest daughter was raped at nine o’clock in the morning. I don’t know if I could be impartial.
During the jury challenge process, counsel for Robinson sought to challenge Mielke for cause, on the stated ground that “[s]he stated that she couldn’t be impartial under any circumstances.” A prosecutor countered that he did not think Mielke said she would not be impartial, but that she only stated that she did not know if she could be impartial and did not affirmatively state she could not be. In finding no abuse of discretion by the trial court in denying Robinson’s challenge for cause as to Mielke, this Court determined that Mielke’s responses did not as a whole reveal facts from which bias, prejudice, or an inability to render judgment according to law might be reasonably implied.
Other eases have upheld the denial of challenges for cause of prospective jurors whose relatives have been crime victims. See State v. Walker, 577 So.2d 770 (La.App. 2d Cir.1991); State v. Thom, 92-911 (La.App. 5 Cir. 2/25/93), 615 So.2d 355.
Defendant has failed to show any abuse of discretion in the trial court’s refusal to grant his challenge for cause as to Ms. Brickley.
Next, he charges error in the trial court’s refusal to grant his challenge for cause with regard to Jennifer Williams, arguing prejudice in her belief that the defendant should testify in order to present a defense.
Ms. Williams responded to defense counsel, “... I would like to have some kind of evidence [of self-defense], or let us know.” Counsel then went on to 12Sexplain, “I’m not talking about some kind of evidence, whether we have some kind of evidence ... ”, Ms. Williams interjected, “Well, I would like to know something.” When asked if the judge instructed the jury that the defendant does not have to testify, Ms. Williams stated: “I would like to hear from him ...” As to questioning about self-defense, Ms. Williams indicated, “I would like to hear from him ... yes, understanding that [that the defendant does not have to testify], but I would have to clear my conscious, [sic] too, and I would like to hear what he has to say.”
The defendant maintains that Ms. Williams’ responses exhibit her prejudice against his right not to testify at trial.
A trial judge’s refusal to excuse a prospective juror for cause is not an abuse of his discretion, notwithstanding that the juror has voiced an opinion seemingly prejudicial to the defense, when subsequently, on further inquiry or instruction, he has demonstrated a willingness and ability to decide the case impartially according to the law and the evidence. State v. Taylor, 2003-1834 (La.5/25/04), 875 So.2d 58, 62.
Following the aforementioned exchange between Ms. Williams and defense counsel, the trial judge reiterated the defendant’s constitutional right not to testify and cautioned the jurors that they could not hold his silence against him. When the judge asked her about her position on the issue, Ms. Williams responded, “I won’t hold it against him, but it would still be in my mind, you know.” Pursuant to additional discussion on the subject of the defendant’s right to remain silent, the trial judge asked Ms. Williams if she could “follow the law” and then said “if you can’t ... I need you to honestly tell me that ... can you do that?” To which Ms. Williams responded, ‘Tes.”
12!)The record of the voir dire, taken as a whole, supports the trial court’s assessment that the juror’s responses did not impair her performance of her duties as a *516 juror. Ms. Williams indicated she understood and would follow the law.
Considering the voir dire as a whole, Ms. Williams exhibited her ability to serve as an impartial juror by her stated ability and willingness to apply the law as instructed by the trial court. There was no error in the trial court’s refusal to grant the defense challenge for cause as to Ms. Williams. This assignment has no merit.

CONCLUSION

For the reasons stated above, we affirm defendant’s convictions, amend the manslaughter sentence to delete the denial of parole eligibility and instruct the trial court to make a minute entry and a new commitment form reflecting this change. As amended, we affirm the sentences.
AMENDED AND AFFIRMED.

. Detective Hamilton explained that the gun was originally found in the victim’s pocket. Hamilton removed the gun from the victim's clothing and photographed it for investigation purposes.

. The video recording was identified as State’s Exhibit 7, while State’s Exhibit 8 is the transcription of the audio portion of the recording. This recording was played for the jury.

. The State and defense stipulated that State's Exhibit 9 was the video recording of the defendant's February 2, 2009, statement to Hamilton concerning the June 19, 2008, Den-zel Williams homicide. The State played the recording of the interview for the jury.

. The State played State’s Exhibit 22 for the jury.

. This Court denied supervisory review of the denial of the Motion for Severance in State v. Brandon Ruffin, unpub., 2010-0866 (La.App. 4 Cir. 6/21/10), as did the Supreme Court in State v. Ruffin, 2010-1467 (La.6/25/10), 39 So.3d 582.

. The “jury shield law” renders inadmissible any evidence of the actual deliberative processes of the jurors except as to "whether any outside influence was improperly brought to bear upon any juror” or "whether extraneous prejudicial information was improperly brought to the jury’s attention.” See Tanner v. United States, 483 U.S. 107, 117-119, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987).

. La.C.Cr.P. art. 771 provides:
Admonition
In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:
(1) When the remark or comment is made by the judge, the district attorney, or a court official, and the remark is not within the scope of Article 770; or
(2) When the remark or comment is made by a witness or person other than the judge, district attorney, or a court official, regardless of whether the remark or comment is within the scope of Article 770.
In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.

. C.E. art. 404(B) provides in part:
Character evidence generally not admissible in civil or criminal trial to prove conduct; exceptions; other criminal acts Other crimes, wrongs, or acts. (1) Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other puiposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.

. The statement is not included in the record.

. La.C.Cr.P. art. 921 reads:
Matters not grounds for reversal
A judgment or ruling shall not be reversed by an appellate court because of any error, defect, irregularity, or variance which does not affect substantial rights of the accused.