MAX N. TOBIAS, JR., Judge.
hThe defendant, Tyrone B. Jortes (“Jones”), appeals his convictions for second degree battery and simple rape. Finding no merit to any of his counseled or pro se assignments of error and no patent errors, we affirm his convictions and sentences.
STATEMENT OF THE CASE ■■<
Jónes was charged by grand jury indictment on 13 September 2012, in Count 1 with aggravated rape, a violation of La. R.S. 14:42,[1] and in Count 2 with second degree-kidnapping, a violation of La. R.S. 14:44.1. Jones pleaded not guilty to both counts at his 18 September 2012 arraignment. On 16 June 2014, the state amended Count 1 to charge aggravated second degree battery, a violation of La. R.S. 14:34.7, and amended Count 2 to change forcible rape, a violation of La. R.S. 14:42.1.[2] Jones pleaded not guilty to both amended counts: Jones was tried by á twelve-person jury on 11-13 August 2014 and found guilty on Count 1 of the lesser | gpffense of second degree battery and on Count 2 of the' lesser offense of simple rape.[3] The trial court denied Jones’ motions for new trial and post-judgment verdict of acquittal on 28 August 2014. Jones was sentenced on 15 September 2014 to five years at hard labor on Count 1 and twenty-five years at hard labor without benefit of parole, probation, or suspension of sentence on Count 2, both to run concurrently and with credit for time served. The trial court denied Jones’ oral motion to reconsider sentences and granted Jones’ motion for appeal.

FACTS

New Orleans Police Department (“NOPD”) 911. operator Giselle Bertrand identified two exhibits, respectively, as an audio recording of a 911 call and an inci *258 dent recall printout.[4] The recording was played for the jury and the incident recall was published to it. The incident recall reflected a Signal 42, meaning, to Ms. Bertrand’s knowledge, a rape. She confirmed that the audio recording was consistent with the incident recall.
NOPD Officer Kenny Guidry testified that on 21 July 2012, he responded to a Signal 42 rape call at 3501 Garden Oaks in the Algiers section of New Orleans. When asked to describe the victim, the officer said she seemed to be “very, very nervous, afraid” and “basically was in a terrified state of mind.” He said she was visibly injured; he could see bruises on her body. The officer learned that the perpetrator had gone to Wal-Mart and would be returning to the scene. The perpetrator arrived in the company of a young male child, who the officer ^estimated was four or five years old. He detained the perpetrator. He did not recall observing any injuries to the perpetrator.
Officer Guidry confirmed on cross examination that Jones identified himself and did not run from or resist him. The young boy was eating candy and did not appear to be harmed. When confronted with his police report, Officer Guidry testified that it noted that Jones was sober and had a minor injury. The officer stated on redirect examination that a minor injury could be a scratch or something very minor.
NOPD Detective Keisha Ferdinand attended to the aggravated rape call on 23 July 2012 at 3501 Garden Oaks, a multistory apartment complex.[5] She observed several bruises to the victim’s eye; the victim complained of pain, and was very quiet, “kind of in a zombie state,” appearing to be disoriented and “out of it.” The victim had a small baby and another child to which she was trying to tend. Detective Ferdinand identified an exhibit as a CD from the crime lab marked with NOPD item # G-33993-12. The detective went through photographs depicted on the CD, including photographs of the victim depicting a black left eye, scratch marks on her left breast, and lacerations to her index and middle finger of her right hand. Some photographs depicted the living room and sofa situated in that room, Jones’ bedroom, and the bathroom and closet entering the bathroom. A stained towel on the floor was confiscated as evidence. Detective Ferdinand identified an exhibit as a large towel that was on the bed and an exhibit as a white towel from the bathroom. Two exhibits were respectively identified as a pink fitted sheet and |4a comforter, from the bed. One photograph was of a shotgun that Detective Ferdinand testified was recovered from a closet in the residence.
Detective Ferdinand confirmed that she transported the victim to University Hospital for a sexual assault examination. She had to secure an NOPD chaplain because the victim was crying and unable to formulate her statement because she was so upset. She also applied for a search warrant to obtain a buccal swab from Jones to compare his DNA profile to any male DNA profile obtained from the victim, all of which evidence was sent to the Louisiana State Police Crime Lab for analysis. Detective Ferdinand also testified that on 10 August 2012, she monitored from a separate room the interview of the victim’s five-year-old son at the Child Advocacy Center (“CAC”). The detective was able to relay questions to the interviewer which were then asked of the child. Detective *259 Ferdinand testified on cross examination that she did not observe any injuries oh the victim’s son.
Laura Andrews was qualified as an expert in the field of sexual assault examinations. She conducted a sexual' assault examination of D.M., the victim, on 23 July 2012. Ms. Andrews identified an exhibit as forensic forms filled out by nurse sexual assault examiners in their examinations. The' forms reflected thát D.M. reported having an altercation with her ex-boyfriend that involved a physical assault. D.M. reported being pushed and punched repeatedly in her face and stomach. She said her face was stepped upon and she was twice strangled vnth her attacker’s forearm. During one episode she experienced a nose bleed. Jones hit her and she saw stars; she believed that she lost consciousness. She next recalled waking up naked in a shower and her attacker throwing water in her face. She.slept a lot afterward. Jones removed his clothes and got into- bed with her. She told him she was not having sex with him. She tried to push him off but he Lvaginally penetrated her, whereupon she screamed and said no. Jones continued and ejaculated without a condom. Jones took her phone so she had to go next do,or to a neighbor’s house to ask the neighbor to telephone the police.
Ms. Andrews testified that the victim had lacerations to the first and second fingers of her right hand and a bite mark on the second finger of her right hand. D.M. told her she sustained the lacerations when Jones held a knife to her abdomen, she grabbed it, and he then pulled it out of her hand. D.M. had swelling and dark purple bruising around her left eye. The victim complained of pain in her neck and her right rib area, and had multiple bruises on both sides of her arms with tenderness to her abdomen. Ms. Andrews recalled that the victim had some scars that resulted from previous physical assaults by Jones. The victim reported that she last had sexual intercourse over three weeks earlier, The report noted that the victim was crying and shaking, and that her voice was quivering during the interview. Ms. Andrews identified an exhibit-as a CD of photographs she took of,the victim’s injuries, during the sexual assault examination, which photos were displayed to the jury in a video presentation.
‘ Ms. Andrews detailed her pelvic examination of the victim. She observed one abrasion during this examination, to the posterior fourchette — the bottom of the entrance to the vagina — at the seven o’clock position. • She said most likely it was caused by blunt force trauma, and she •confirmed that a sexual encounter, a rape, can be blunt force trauma. Ms. Andrews said it was highly unlikely that one could sustain that type .of abrasion from everyday activities, and .that those types of abrasions usually heal within three days, or a week at the most, to where they are not visible to the naked eye. She collected vaginal and anal swabs, swabs from under the victim’s fingernails, swabs from .her fingers, and a swab from the bite Lmark on her left breast. Ms. Andrews testified that the victim was, with her approximately four hours, but that afterward, because of what she characterized as the victim’s “extensive injuries,” she went to the emergency room for more x-rays and scanning.
Ms. Andrews confirmed on cross examination that the vaginal abrasion was superficial, that one can never say exactly what caused such an injury, and that one could not say that' it necessarily was caused by forced sex. It was • also established on cross examination that the vaginal abrasion was the only non-normal finding made during the -pelvic and anal examination. She confirmed- that x-rays and scans revealed no fracture and no internal bleed *260 ing. Ms. Andrews confirmed that it was only after she noticed the lacerations that the victim told her about Jones using the knife.
Ms. Andrews stated on redirect examination that the vaginal abrasion was suggestive of a sexual assault injury; it was uncommon for that injury to occur during consensual sex. She also testified that the majority of sexual assault'victims have no external vaginal injuries, and that injury to the external fourchette (bottom of the vagina) was the most common such injury. Ms. Andrews stated that sexual assault victims often do not recount the events in .a “linear” manner. Thus, she did not think it peculiar that D.M. did not mention the knife aspect of her assault until she noticed the lacerations on her fingers and asked her about it — “[tjhat happens all the time,” she said.
Glenn Fahrig, a forensic DNA analyst with the Louisiana State Police (“LSP”) Crime Lab, was qualified as an expert in the field of forensic DNA analysis. Mr. Fahrig testified concerning the accreditation of the LSP Crime Lab, DNA evidence and analysis generally, and the DNA evidence and analysis’ in the |7present case. He identified his report in the case as an exhibit. His DNA testing showed that the sperm fraction of the DNA derivéd from separate intérnal and éxternal vaginal swabs taken from the victim, as well as from right and left-hand fingernail swabs taken from her, contained a major contributor that was .consistent with the victim’s reference DNA profile. However, “the minor contributor’s profile was too low to do any comparison (to Jones’ reference DNA profile).” He could not match Jones’ DNA profile to the DNA evidence derived from the victim. Mr. Fahrig testified that normally in such a case one performs YSTR DNA testing, which is specific to the male Y chromosome part of the DNA material. He confirmed that YSTR testing was performed in this case, but that he did not do it. He confirmed on cross examination that no testing for DNA was performed on a sheet or a comforter. He stated on redirect examination that testing cannot determine the length of time that something has been deposited, i.e., when DNA material was placed onto a bed sheet.
Stacy Williams, a forensic DNA analyst at the LSP Crime Lab, was qualified as an expert in that field. She identified an exhibit as the YSTR DNA analysis report issued by Ms. Julie Naylan Kirk. Ms. Williams testified that a DNA profile derived from the victim’s right-hand fingernail swabs was “consistent” with the “Y-DNA” profile dei’ived from Jones’ reference sample, ■ She confirmed that this meant the DNA profile was consistent with Jones and all of the male individuals within his biological paternal lineage.
Ms. Williams confirmed on cross examination that she was the technical reviewer and that the actual analyst had been Ms. Kirk. She confirmed that Ms. Kirk was not asked to do any testing on a hand towel, a fitted sheet, or a comforter.
IsDaniel Dooley, a forensic interviewer at the CAC in New Orleans, testified that he interviewed K.D., the victim’s son, who was five years old at the time of the crimes. The interview took place on 10 August 2012 and was supervised by Detective. Ferdinand.
D.M. testified that she was then thirty years old and the mother of three children, a son, K.D., then age seven, and two daughters, ages two and four. Jones was the .father of the two girls. ■ She and Jones lived together for approximately three and one-half years. She said their relationship ended after a fight between them in April 2012, during which she received a black eye, a cut on her lip, and a scalp wound resulting from his ramming her head into *261 a door. She testified that she got tired of him hitting her, something he had done throughout their relationship. She left the common abode and took the children to her mother’s home in Kenner. On 21 July-2012, she went to Jones’ home in Algiers to watch the children while Jones was. at work. D.M. fed the children, put them to bed, and fell asleep on his sofa.
D.M. testified that Jones returned from work around 11:00 p.m. He grabbed her cell phone and she went into the bathroom. When she returned, he asked her who “Junior” was. “Junior” had apparently called D.M.’s cell phone. D.M. told him. “Junior” was her brother whom she had not seen in years. She said she was ecstatic and asked for her cell phone. Jones accused her of sleeping with someone else and did not believe that the caller was her brother. He accused her of being pregnant and began punching her in her stomach, knocking her to the ground once, and again when she got up, causing her to fall to the floor a second time. She also testified that he tried to strike her with a glass table top. She said he threatened (to hit) her with her own coffee mug, but did not. He kept calling her a liar and then |9the discourse intensified. She referred to it as a fight, but then said she wouldn’t call it a fight; she later explained that Jones was bigger than she was and, thus, how could she “fight him” or “fight him back.”
D.M. stated that Jones obtained a shotgun and put it to her head. She indicated that he “racked the slide” on the shotgun and “pressed the button and it didn’t go,” and that he did that two more times. He punched her in her face and threw her across the room. Jones kept stomping on her and she remembered waking up in the shower with him splashing water in her face. He continued to call her a liar while punching, hitting, and choking her. He was choking her and. telling her to tell him the truth — that the caller on her cell phone was .someone, she was involved with — and that if she did. he would let her go. D.M. stated that she finally, told him <fYes, yes, yes,” and he let her go.
•D.M. said she woke up in the shower again, naked, with Jones again splashing water in her face. She was asked whether Jones ever threatened her with a knife, and D.M. said that she had forgotten about that. She said he held a knife to her stomach, right above her navel and he was pushing it in, when she grabbed it. Jones then pulled it away and: sliced her fingers. She ended up with a towel wrapped around her hand.
D.M. testified that she then found herself in bed naked. She did, not know whether she lost ■. consciousness or just went to sleep. But - she felt something heavy on her chest and ribs. She opened her eyes to see Jones on top of her. D.M. recounted that when she first arrived, at Jones! home she told him. she was not having sex with , him. She stated that Jones had said something to the effect of: “All right. All right.” D.M. said Jones was on top of her and she again .told him she did not want to have sex. She unsuccessfully tried to move her legs. Jones | inwas kissing her and fondling his penis for a bit and then “he inserted it.” .When Jones finished, he gave her a kiss, told her he loved her,, and left the room. Jones left the apartment with her son, and D.M. bathed her two daughters. She later left the house with them and called the police. D.M., testified that she had never telephoned the police before during her relationship with Jones. She identified photographs of her and her injuries, as well as photos of the crime scene and the shotgun with which she had been threatened.
D.M. confirmed on cross examination that she did not recall telling investigating police officers or Detective Ferdinand *262 about the knife. She confirmed that the first time she could recall telling someone about the knife was when she'was talking to the nurse during her sexual assault examination. She also said she did not remember whether she mentioned to anyone that Jones held a gun to her head. She confirmed that she did not mention anything to the 911 operator about being raped.
D.M. testified on redirect examination that when she called 911 she did not tell the operator about the knife, the gun; or that she was raped because she just wanted to get away from Jones.
K.D. stated his name and testified that he was seven years old. He testified that he knew the difference between telling the truth and telling a lie, saying that “you get in a lot of trouble'if you tell a lie,” and confirmed that you are not supposed to lie. K.D. testified that he remembered his mother and Jones fighting a couple of years earlier and meeting with a man in a room for a video-recorded interview. He replied ■ in the negative whether anyone ever told him what to say. He identified himself in a short clip of the video interview and established that he remembered it. The video was played over an objection by defense counsel that | nhad been previously asserted, and also objected that the state had not laid a proper foundation for it pursuant to La. R.S. “15:445” — presumably La. R.S. 15:440.5.
K.D. confirmed on cross examination that he was living with his mother, but he shook his head negatively when asked whether he lived with his grandmother too. He replied in the affirmative when asked whether “back then” he was living with his mother, his two sisters, and his grandmother. K.D. confirmed that he had earlier said when talking with the assistant district attorney that when you tell a" lie you have to keep on telling that lie because if someone finds out you told a lie you could get into trouble. K.D. replied in the negative when asked on redirect examination whether anybody ever told him what to say on the video they had just watched. When asked whether he was telling the truth or a lie on that video, K.D. replied that he was telling the truth.
Officer Guidry was recalled by the defense. (He was one of the initial responding officers to the scene of the incident.) When'asked whether D.M. told him that she was raped around' noon on Sunday, he replied that he could not recall exactly what time she told him, but that it should be indicated in his report. He then refreshed his recollection with his report, and confirmed that it said “about noon,” “on the 22nd, 2012.” He confirmed that D.M. told him that Jones forced her into the bedroom and forced her to have sex with him by hitting her in thé face with a closed fist.
Detective Ferdinand was recalled as a witness. She interviewed D.M. on 23 July 2012, and D.M. never mentioned anything about a knife or a gun being used against her. She again stated on cross examination that she interviewed D.M. before her sexual assault examination, and that D.M. “was in a zombiertype state as if she was out of it in a sense.” Detective Ferdinand testified that a chaplain was 11galso present during her interview of D.M. When asked whether a chaplain is usually in the room when a victim is giving a statement, she replied in the negative, stating that D.M.’s was a special case. When asked why it was a special case, Detective Ferdinand replied that it was “[d]ue to the condition of the victim and the nature of the victim at that time, emotional.”

ERRORS PATENT

A review of the record reveals no error patent on the face of the record.

*263
ASSIGNMENT OF ERROR NO.l

In his first assignment of error, Jones argues that the trial court erred in failing to excuse for cause prospective jurors who were victims of, or were related to victims of, physical and/or sexual abuse.'
Louisiana Constitution article I, § 17 guarantees to a defendant the right to full voir dire examination of prospective jurors and challenge jurors peremptorily. In trials of offenses punishable by imprisonment at hard labor, as in the present case, a defendant has twelve peremptory challenges and the state has twelve. La. C.Cr.P. art. 799. Prejudice is presumed when a defendant’s challenge for cause is erroneously denied and he has previously exhausted all of his peremptory challenges. State v. Carmouche, 01-0405, p. 8 (La.5/14/02), 872 So.2d 1020, 1028; State v. Kirk, 11-1218, pp. 10-11 (La.App. 4 Cir. 8/8/12), 98 So.3d 934, 941.
When a defendant uses all twelve of his peremptory challenges, a trial court’s erroneous ruling on a defendant’s challenge for cause that results in the deprivation of one of his peremptory challenges constitutes a substantial violation of his constitutional and statutory rights, requiring reversal of his conviction and sentence. State v. Juniors, 03-2425, pp. 7-8 (La.6/29/05), 915 So.2d 291, 304; State v. Fields, 13-1493, p. 22 (La.App. 4 Cir. 10/8/14), 151 So.3d 756, 771. Therefore, to establish reversible error in the denial of one of his challenges for cause, a defendant needs to show that: (1) he exhausted all of his peremptory challenges; and (2) the trial court erred in refusing to grant his challenge for cause. Carmouche, supra; Juniors, 03-2425, p. 8, 915 So.2d at 305.
A trial court is vested with broad discretion in ruling on1 challenges for cause, and its ruling will only be reversed when a review of the voir dire as a whole reveals an abuse of discretion. State v. Anthony, 98-406, p. 22 (La.4/11/00), 776 So.2d 376, 391; State v. Brown, 12-0626, p. 14 (La.App. 4 Cir. 4/10/13), 115 So.3d 564, 574.
The record reflects that Jones exhausted his peremptory challenges. Jones complains of the denials of his respective challenges for cause of prospective jurors Ms. P and Ms. B. The ground of both challenges for cause was that the two prospective jurors were not impartial.
La.C.Cr.P. art. 797 sets forth the grounds for challenges for cause, including the ground that the prospective juror is not impartial, stating in pertinent part:
The State or the defendant may challenge a juror for cause on the ground that:
[[Image here]]
(2) The juror is not impartial, whatever the cause of- his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be ■ sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render -an impartial verdict according to the law and the evidence; ...
| uJuror Ms. P
During voir dire of the first panel of prospective jurors, Ms. P asked to speak to the court privately; an off-the-record bench conference was held with her and all counsel. During the challenge conference, Ms. P revealed that her sister had been the victim- of a sexual assault. Ms. P was a pediatric nurse who had seen children who presented as victims of domestic physical abuse at home. Ms. P agreed with defense counsel that because of the nature of heh work she was inclined to believe someone reporting abuse. When *264 asked by defense counsel about someone going into a hospital and saying that.be/ she had been a victim of sexual assault, Ms. P replied:. “I feel, naturally inclined to believe them.” Jones correctly notes in his appellate argument that Ms. P also agreed with another prospective male juror who stated during voir dire by the defense that a prior conviction or allegation against Jones would be something in the back of his mind. But, in stating that she agreed with the other juror’s statement, Ms. P’s full answer was; “I agree. I guess it is just another piece of the puzzle.”
Later, during the challenge conference, defense counsel appeared to challenge Ms. P for cause because her. sister had been the victim of a sexual assault and because of her statement that she would be. inclined to believe someone claiming sexual assault. Ms. P was called into chambers and asked by the trial judge whether she could put aside her past horrible experiences and evaluate the evidence presented in the case. Ms. P replied: “I think I could.” The trial court also asked Ms. P whether she would be able to step out of her occupation and evaluate the credibility of <a victim as she was testifying. ■■ Ms. P replied: “I believe so.”- Defense counsel .questioned Ms. P concerning her sister’s case, where a grand jury did not indict the alleged perpetrator, and her sister filed a civil suit and |1fiobtained a judgment against her assailant. Defense counsel asked Ms. P whether,-considering her sister’s experience, she believed that in a case where a grand jury does return an indictment “that something probably happened.” Ms. P replied:. “No.” When asked by defense counsel how she would guard against letting her personal experiences.affect her weighing of the evidence in the case, Ms. P replied:- “I think you are just aware of what your tendencies are and just go back to the evidence.” No further questions were asked.
In arguing the challenge of Ms. P for cause, defense counsel represented that, at the unrecorded bench conference, Ms. P had stated that she “may require less” insofar as the state’s burden of proof. However, the record does not reflect this, and Ms. P’s final answers during the challenge conference belie that suggestion.
Defense counsel also noted that’ Ms. P had agreed with a prospective male juror who stated during voir dire by the defense that a prior conviction or allegation against a defendant would be something in the back of his mind. However, following that comment, the trial court interrupted defense counsel. The court then stated that “[i]t is one thing to have something in the back of your mind.” He then asked prospective juror Ms. 0, whether her beliefs as to an allegation of prior conduct or an incident would affect her ability to vote not guilty if the evidence of the crime for which Jones was on trial had not been proven to her beyond a reasonable doubt. Ms. 0 answered that she did not believe it would and that- she thought she could vote to find the defendant not guilty. The trial court then asked the panel of prospective jurors whether anyone disagreed with Ms. O’s statements. One prospective juror stated that he did not have any problem being objective, that it was the way the question was framed. The trial judge stat-éd: |lfi“Right, that is why I’m asking it in a little bit more clear fashion.” Ultimately, in the challenge conference the trial court denied the challenge for cause as to Ms. P.
In State v. Howard, 441 So.2d 389 (La.App. 4th Cir.1983), the defendant, convicted of two counts of armed robbery, complained on appeal that the trial court erred in failing to excuse for cause a juror whose daughter had been a victim of violent crime. The juror never said she would be *265 unable, to render an impartial verdict, although . she. did say she could not forget what had happened to her daughter. She first said “I guess so” when asked whether she would be able to be a fair and impartial juror. ..On the final question on the subject the prospective juror answered a simple “yes” when asked whether she could independently judge the evidence and not let what happened to her daughter influence her verdict in the case. The defendant characterized the juror’s affirmative reply as a “feeble” yes. However, this court noted that it was necessarily a decision for the trial court whether such affirmative reply was “feeble,” and it found no abuse of discretion in the trial court’s denial of the challenge for cause as to that juror.
In State v. Ruffin, 11-0135 (La.App. 4 Cir. 12/21/11), 82 So.3d 497, the defendant was convicted of one count of second -degree murder and one count of manslaughter. On appeal, the defendant argued that the trial court erred in denying his challenge for cause of a juror whose thirteen-year-old great-niece had been killed in a violent crime. When asked' whether that would affect her ability to sit on the jury, the juror replied: “It may.” When questioned further, the juror told the prosecutor that she was “quite sure I’ll be emotional because I will have flashbacks, because I still have not gotten over that yet. And her killers have not been found.” Id. at p. 25, 82 So.3d at 514. This court found no abuse of the trial court’s denial of the challenge for cause, noting that the juror did not say unequivocally that her 117grand-niece’s death would prevent her from being an impartial juror. ; This court further noted that, while the prospective juror stated that she might be emotional because of the violent crime, she did not indicate that her emotional state would have an adverse effect upon her deliberation as to the defendant’s guilt.
In State v. Robinson, 08-0652 (La.App. 4 Cir. 5/13/09), 11 So.3d 613, jurors were asked by the prosecutor whether any of them had a family member, or friend who had been a victim of violent crime. One juror replied that her son had been robbed and pistol-whipped four years previously; someone had attempted to carjack -her younger daughter two years before that; and her oldest daughter had been raped. The juror said she did not know whether she could be impartial. The defendant challenged the juror for cause, stating that she had stated that she could not be impartial under any circumstances. 'The prosecutor countered that he did not think the juror said she would not be impartial, only that she did not know whether she could be. In finding no abusé of discretion by the trial court in denying the challenge for cause, this court determined that the juror’s responses did not as a whole reveal facts from which bias, prejudice,' dr an inability to render judgment according to law might be reasonably implied.
Regarding Ms. P, Jones argues that even though she “thought” she could evaluate the ease on the evidence and “said she believed” she could judge the witnesses’ credibility fairly, “her experiences and her answers, taken as a whole, demonstrate the opposite.” This conclusory argument is not supported by the record. The. trial court concluded that Ms. P’s responses did not as a whole reveal facts from which bias, prejudice, or an inability to render judgment according to law might be reasonably implied. Thus, the trial court did not abuse its discretion in denying the challenge for cause as to Ms. ,P.
[ yjuror Ms. B
In the second venire panel, Ms,. B, a retired college professor, approached the bench during the course of voir dire and *266 indicated she had been a victim of domestic violence in the past. During the challenge conference, the trial court called Ms. B into chambers and asked whether she would be able to focus solely on the evidence and witnesses presented in making a determination of guilt or innocence. The following colloquy occurred, beginning with Ms. B’s response to the court’s question:
MS. [B]:
I hope'so. I think so.
THE COURT:
Can you be a little bit more assertive in that?
MS. [B]:
I hope so. I would do my best. It was just a very difficult situation and I feel very — It was a very emotional situation. I don’t know that I could be completely objective about someone accused of that. I would tend, perhaps, to judge them perhaps a little harder than I mighf-r-but I would try not to. I would certainly try to be objective.
THE COURT:
Would you take into account that you would first have to be convinced that something took place beyond a reasonable doubt?
MS. [B]:
That is right. I think I ■ could. I think I could.
THE COURT:
Thank you Ms. [B]. You can step out.
Defense counsel stated that he “would still move to strike her for cause,” arguing that Ms. B was saying she “very well may judge [Jones] harder because of the — because of her experience and it was very difficult and emotional.” The trial judge noted for the record that, in her opinion, Ms. B was not emotional in any |19way. The court stated that it would rely on Ms. B’s responses and it denied the challenge for cause. Again, we do not find that the trial court abused its discretion in implicitly concluding that Ms. B’s voir dire responses did not, as a whole, reveal facts from which bias, prejudice, or an inability to render jfidgmerit according to law might reasonably be implied.
This assignment of error is without merit.

ASSIGNMENT OF ERROR NO. 2

PRO SE ASSIGNMENT OF ERROR NO. 2

In his second assignment of error, Jones argues that the trial court erred in allowing into evidence the video recording of the interview of the victim’s five-year-old son, K.D., which was conducted at the CAC several weeks after the crime. Jones characterizes the recording as “fraught with hearsay.” Jones also argues that the trial court -erred in editing the video to delete the admission by K.D. that his grandmother provided him with information, thus allowing the “impression” that the rest of the video was the “truth” of what K.D. had seen and heard. Jones additionally complains that the error was compounded when the prosecutor “failed to correct” K.D. during the child’s trial testimony when he testified that no one had influenced his testimony despite knowing the contrary was true. Jones raises these same issues in his, pro se assignment of error No. 2.
The crimes for which Jones was convicted occurred on or about 21 July 2012. K.D. was interviewed at the CAC on 10 August 2012. On the morning of trial, Jones filed a motion to exclude hearsay contained in the CAC tape and to prevent a child witness from testifying to hearsay. Jones moved to exclude any live testimony or the video recorded interview of K.D. “about incidents that he did not personally observe.” Jones alleged that, according to *267 the CAC recording, K.D. |2o“was in another room at the time of the alleged incident and he did not personally see what óc-curred in that room.” Jones made reference to K.D. stating in the interview that he had a conversation with his grandmother who was not present in the apartment at the time of the crimes. Jones concluded by stating that “such hearsay statements as recorded in' the CAC tape' or as the state seeks to introduce through live testimony does [sic] not fall within a valid hearsay exception,” and ¡that the statements should be excluded. .
Pursuant to La. R.S. 15:440.1, et seq., K.D. was a “protected person” by virtue of his being under the age of seventeen and a witness in a criminal proceeding. La. R.S. 15:440.2 C(l). La. R.S. 15:440.3 provides that a video recording of a protected person is admissible in evidence as an exception to the hearsay rule.[6]
Jones’ motion was briefly discussed on the first morning of trial following voir dire. The trial court delayed a final decision until after defense counsel had an opportunity to listen to the full recording. The court also stated that it- had listened to twenty-two minutes of the thirty-nine-minute recording and was going to listen to the rest of it before issuing a final ruling. Nevertheless, the court stated that it wished to redact one sentence at the fourteen-minute point, when K.D. stated: “My grandma said he put his legs around her and stabbed her in the stomach,” because it was hearsay (double hearsay — hearsay within the hearsay recording). Defense counsel lodged no objection at this point.
The following morning, 12 August 2014, the court stated that it had listened to the rest of the CAC recorded interview of K.D. and that the only thing that was l^to be redacted was the one sentence where K.D. recounted what' his grandmother told him. The' court said it would mute- the tape at that point when it was being played for the jury. Defense counsel replied at that time: “Just note our objection, please.” However, when the state offered the CAC recording into evidence and played it for the jury, defense counsel noted the earlier objection and sáid: “Additionally, I don’t think the State has laid the foundation under Louisiana Revised Statute 15:445.” Presumably this was a reference to La. R.S. 15:440.5.
On appeal, defense counsel argues that “[a]s a result of the delay” between the alleged crimes,. Jones’ arrest, and the CAC interview of K.D., his statement is entangled in hearsay. Jones asserts that, although K.D. testified at trial that no one had told him what to say, “it was clear that his grandmother and/or "others had.” Jones further asserts that events K.D. recounted as “knowing” about could not have been seen from the living room where he said he was seated with his younger sisters. However, Jones fails to cite a single example of such hearsay or cite any particular place in the video where such purported hearsay is related by K.D.
K.D. starts out in the video statement saying that his mother and Jones fought on certain days. He stated that one day in particular they fought. When asked if he saw them fighting, he said he did not, but that he heard them from the living room where he was with his sisters. When asked what he heard, K.D. said he heard a "bump " and his mother screaming. He heard his mother, address someone, asking the person if he/she was going to. shoot *268 her. K.D. talked about his mother screaming when Jones dropped her on the floor. However, this could be KJD.’s speculation as to the sound he heard as being that of his mother’s body hitting the floor. When he went into the room, his mother had a black eye. K.D. was asked where Jones was when he (K.D.) went into the room, and. the child replied that |22Jones was. in the room. K.D. stated that Jones asked him if he wanted to go to the store with him. (This is heard ten minutes into the video.) ,
To the extent that any of these statements made by K.D. might arguably be considered hearsay (within the hearsay recording), they were all part of the res gestae and thus admissible.[7]
Considering that Jones fails to cite any particular “hearsay” related by K.D., except for his direct reference to his grandmother telling him that “he put his legs around her and stabbed her in the stomach,” (which the jury did not hear), Jones has failed to establish any error by the tidal court relative to admitting K.D.’s statement insofar as it contained any additional hearsay.
In.the heading to the present assignment of error, Jones asserts that the trial court’s errors admitting the CAC video and in editing it “only to delete” what K.D. said his grandmother told him “violated the statute authorizing the entry of a CAC video into evidence.” Jones asserts that “the editing of a CAC video prior to its introduction is prohibited by statute. See La. R.S. 15:440.5.” Jones correctly cites and quotes La. R.S. 15:440.5, in pertinent part, as follows:
• A. The videotape of an oral statement- of the protected person made before the proceeding begins may be admissible into evidence if:
[[Image here]]
. (3) The recording is accurate, has not been altered, and reflects what- the witness or victim said;
| ¡¿La. R.S. 15:440.5 A sets forth eight “requirements” for the admission of “a videotape of an oral statement of the protected person.” While defense counsel objected to the introduction and playing of the CAC recording on the general ground that the state failed to lay a proper foundation, he does not make that argument on appeal. Jones actually makes no argument as to this specific “lack of a foundation” issue. His argument, derived from the heading of the assignment of error, is that the admission of the CAC video “violated the statute authorizing the entry of a CAC video into evidence” because La. R.S. 15:440.5 A(3) states that such a video statement “may be admissible into evidence if’ “[t]he recording ... has not been altered.... ” However, Jones did not preserve that issue for appellate..review because he did not object to the admissibility of the video statement on that ground.
La.C.Cr.P. art. 841 states:
A. An irregularity or error cannot be availed of after verdict unless it was *269 objected to at the time of occurrence. A bill of exceptions to rulings or orders is unnecessary. It is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take, or of. his objections to the action of the court, and the grounds therefor.
B,. The requirement of an objection shall not apply to the court’s ruling.on any written motion.
La.C.Cr.P. art. 841 A is referred to as “the contemporaneous objection rule.” State v. Knott, 06-2252, p. 2 (La.5/5/06), 928 So.2d 534, 535. The rule has two purposes: (1) to require counsel to call an error to the trial court’s attention at a time when it may correct the error; and (2) to prevent defense counsel from “sitting on” an error and gambling on a favorable verdict, only to later resort to appeal after | ¡^conviction on an error that might have been corrected at trial. Id.; State v. Coleman, 12-1408, p. 20 (La.App. 4 Cir. 1/8/14), 133 So.3d 913.
Under La.C.Cr.P. art. 841 A, not only does an objection have to be made, but the defendant must make known the grounds for his objection; one is limited on appeal to those grounds articulated at trial. State v. Ott, 10-1307, p. 13 (La.App. 4 Cir. 1/5/12), 80 So.3d 1280, 1287.
La.C.Cr.P. art. 841 B states that the contemporaneous objection rule “shall not apply to the court’s ruling on any written motion.” However, the issue relative to the trial court excising that one sentence from KD.’s statement only arose at trial. Thus, the contemporaneous objection rule applies.
Defense counsel contemporaneously objected to the state introducing the CAC video into evidence during the testimony, of K.D., citing what counsel referred to as “our earlier objections” (none of which had anything to do with .La. R.S. 15:440.5), and stating: “Additionally, I don’t think the State has laid the foundation under Louisiana Revised Statute 15:445.” This objection did not set forth the. specific .objection that KD.’s video statement could not be admitted under La. R.S. 15:440.5 if the trial court .excised the hearsay within the hearsay statement. The vague objection that “I don’t think” the state laid a proper foundation for the admission of the statement under La. R.S. 15:440.5 did not suffice as a specific objection that one of the “requirements” (i.e., that it “has not been altered”) has not been met.
Any argument that the trial court erred in admitting the ÓAC video statement of K.D., or in excising thé'one hearsay statement, was not preserved for appellate review.
|¾Jones also argues that he was- prejudiced because the trial court’s exclusion of only that portion of the video statement “had the effect of allowing the rest of the video to be accepted as the ‘truth’ of what K.D. had heard and seen.” However, Jones did not object to the trial court’s excising of KD.’s reference to what his grandmother told him on any ground. More importantly, the trial court’s ruling effectively granted, in part, Jones’ motion in limine, insofar as that part of statement in which K.D. states what his grandmother told him was clearly hearsay. Jones’ written motion and argument was that the entire content of KD.’s statement was hearsay (within hearsay) because K.D. did not personally observe what he related in his statement. While Jones may complain on appeal that the trial court erred by failing to exclude the entire video statement, he cannot complain that the trial court erred in excising what clearly was hearsay — which had been the object of his written motion.
*270 Jones also makes a one-sentence argument in this assignment of error that the twenty-day delay in conducting the examination of K.D. “resulted in him giving a statement, most of which was based on information overheard by the child or provided by others who were not subject to cross examination, depriving [him] of his constitutional right to confrontation.” This assignment of error is without merit.
First, Jones cites no authority for the proposition that a “protected person” is limited by La. R.S. 15:440.1, et seq., to relating only what he saw, not what he heard. Further, nowhere does Jones cite any specific statements made by K.D. that were based on “information ... provided by others who were not subject to cross examination.” We find these allegations are purely speculative and without a basis in fact. Finally, Jones’ constitutional right to confrontation was not violated | ^because K.D. actually testified at trial. See State v. Kennedy, 05-1981, p. 26 (La.5/22/07), 957 So.2d 757, 777 (holding—in a case where the video- statement of a protected person was admitted pursuant to La. R.S. 15:440.5 — that, under Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), a testimonial videotaped statement is not inadmissible under the Sixth Amendment’s Confrontation Clause if “the declarant is present at trial to defend or explain it.”).
Lastly, Jones * argues that the state’s use of the video statement by K.D. and its “representation” that what K.D. said was truthful, constituted a violation of Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). Napue holds that, when a prosecutor allows a state witness to give false testimony'without correction, a reviewing court must reverse the conviction if the witness’ testimony reasonably could have affected the jury’s verdict, even if the testimony goes only to the credibility of the witness. State v. Quezada, 13-1318, p. 14 (La.App. 4 Cir. 5/21/14), 141 So.3d 906, 916-917, writ denied, 14-1328 (La.1/23/15), 159 So.3d 1057. However, the reversal of a conviction and the granting of a new trial based upon a Napue violation is proper only where: (1) the statements at issue are shown to be actually false; (2) the prosecution knew they were false; and (3) the statements were material. Id. at p. 14, 141 So.3d at 917, citing United States v. O’Keefe, 128 F.3d 885, 893 (5th Cir.1997).
Jones fails to cite any allegedly false statements by K.D., much less show that any of KD.’s statements were “actually false” and that the state knew they were false. The Napue claim is meritless.
In his pro se assignment of error No. 2, Jones makes the same arguments discussed and found to be without merit here-inabove. Jones also cites and quotes |27the obstruction of justice statute, La. R.S. 14:130.1, but makes, no argument relative to it.
For the foregoing reasons, this assignment of error has no merit.

ASSIGNMENT OF ERROR NO. 3

In the last counseled assignment of error, Jones argues that his twenty-five-year sentence, without benefit of parole, probation, or suspension of sentence, is unconstitutionally excessive. Jones filed a motion to reconsider the sentence after it was imposed, which the trial court denied at the sentencing hearing. , .
La. Const, art. I, § 20 explicitly prohibits excessive sentences. Although a sentence is within the statutory limits, it may still violate a defendant’s constitutional- right against excessive punishment. State v. Martin, 13-0628, p. 16 (La.App. 4 Cir. 5/28/14), 141 So.3d 933, 943, writ denied, 14-1250 (La.1/23/15), 159 So.3d 1056, citing State v. Every, 09-0721, p. 7 (La. *271 App. 4 Cir. 3/24/10), 35 So.3d 410, 417. A sentence is unconstitutionally excessive if it makes no measurable contribution to acceptable goals of punishment, is nothing more than the purposeless imposition of pain and suffering, and is grossly out of proportion to the severity of the crime. State v. Wilson, 12-1765, p. 23 (La.App. 4 Cir. 2/12/14), 138 So.3d 661, 677, quoting State v. Ambeau, 08-1191, p. 9 (La.App. 4 Cir. 2/11/09), 6 So.3d 215, 221. A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice. State v. Vargas-Alcerreca, 12-1070, p. 25 (La.App. 4 Cir. 10/2/13), 126 So.3d 569, 583.
In reviewing an excessive-sentence claim, an appellate court generally must determine whether the trial judge adequately complied with the statutory guidelines in La.C.Cr.P. art. 894.1 and if the sentence is warranted under the facts |2Sestablished by the record. State v. Jones, 12-0891, p. 39 (La.App. 4 Cir. 8/7/13), 122 So.3d 1065, 1087, citing State v. Wiltz, 08-1441, p. 10 (La.App. 4 Cir. 12/16/09), 28 So.3d 554, 561. If adequate compliance with La.C.Cr.P. art. 894.1 is found, the reviewing court must determine whether the sentence imposed is too severe in light of the particular defendant and the circumstances of the case, keeping in mind that maximum sentences should be reserved for the most egregious offenders. Jones, supra, citing State v. Bell, 09-0588, p. 4 (La.App. 4 Cir. 10/14/09), 23 So.3d 981, 984.
 Even without full compliance with La.C.Cr.P. art. 894.1,-however, resentenc-ing is unnecessary where the record shows an adequate factual basis for the sentence imposed. State v. Santos-Castro, 12-0568, p. 30 (La.App. 4 Cir. 7/31/13), 120 So.3d 933, 951, citing State v. Stukes, 08-1217, p. 25 (La.App. 4 Cir. 9/9/09), 19 So.3d 1233, 1250. Finally, La.C.Cr.P. art. 881.4 D expressly states that an ■ “appellate court shall not set aside a sentence for excessiveness if the record supports the sentence imposed.”. . ’ ■ ■
The sentencing'range for simple rape at the time of Jones’? commission of the crime (and his sentencing) was imprisonment, with or without hard labor, without benefit of parole, probation, or suspension of sentence, for not more than twenty-five years. La. R.S. 14:43 B. Jones was sentenced to the maximum'term'of imprisonment — twenty-five yéars at hard labor without benefit of parole, probation, dr suspension of sentence. He was also sentenced to five years at hard labor for his conviction for second degree battery, to run concurrently with his sentence for simple rape.
The victim,' D.M, gave a victim impact statement at Jones’ sentencing. She testified in detail how Jones’? beating and rap: mg her has adversely affected her life. |29She went from feeling safe and being able to see good in everyone to being unable to do things like take her children to the park and to movies, and sit outside for hours. She cannot do that alone anymore because she no longer feels she can protect her children or herself.’ She said she has seen the evil side of human beings that she did not know existed and that she will never again be able to believe that people are completely good. She developed post-traumatic stress syndrome, depression, anxiety, and a panic disorder. She suffered flashbacks, nightmares, and sleepless nights, sometimes going without sleep for three or four days. She said her life has gotten better with the help of therapy and medication, but that it will never be completely fixed. D.M. said she will be on medication for the rest of her life and that she had gone to therapy every week since her beating and rape and was *272 continuing to do so at the time of sentencing. D.M. stated that she will never give up on getting better, both for herself and for the sake of her children. She noted that her panic attacks and fear of being in public by herself will get better over time because she knows (addressing Jones) “that you will never be able to hurt me or my children, and hopefully, any other female again.” She said she would always want to know how he could have done something so horrible to someone he said he loved and wanted to marry. She addressed the trial judge, saying that Jones beat her, raped her, and tortured her, and that if it were up to her he would “never get out.”
Defense counsel requested that the court impose a sentence on the lower end of the sentencing range, detailing' Jones’ difficult life as a child after he and his four siblings were removed from his mother’s home and were bounced around for ten years between foster care homes and living with his parents. Jones fought to get back into high school after being kicked out and graduated. Defense counsel talked ] snof Jones’ “stick-with-it” work history and stated that, at the time of his arrest, he was in line to become a manager at a Copeland’s restaurant. Defense counsel also noted the presence of Jones’ family throughout the court proceedings and that he had their support. Defense counsel stated that because Jones was now a convicted sex offender, he would have to register as such and be subject to thorough supervision after his incarceration. Defense counsel pointed out that Jones was then thirty-two years old with no prior felony convictions.
In sentencing Jones, the trial judge told him that she had reviewed the notes from the trial and the thing that kept sticking out throughout the course of her review were the extent of injuries to D.M. and the look on her face when her injuries were photographed. The court noted the testimony of D.M.’s young son, K.D., being five years, old at the time of the crimes. The court posited what the child’s state of mind was during the course of the perpetration of the crimes. The court also stated that both the emotional and physical scars Jones had inflicted (presumably referring to both D.M. and K.D.) will “never, ever be erased.”
The trial judge told Jones that as far as she was concerned the jury gave him “a pass” on both charges' by finding him guilty of the respective lesser-included offenses of simple rape and second degree battery. The court expressly noted that the injuries D.M. sustained were not, in her opinion, second degree battery, and that the jury could have found Jones guilty as charged of aggravated second degree battery. ■
In State v. Despanie, 06-1269 (La.App. 3 Cir. 2/7/07), 949 So.2d 1260, the appellate court found that a maximum sentence of twenty years at hard labor without benefit of parole, probation, or suspension of sentence imposed on a first offender who was nineteén years old at the time of the offense, and who pleaded |31 guilty to the simple rape of a ninety-year old infirm female patient in a nursing home where he worked, was not excessive.
In State v. Fruge, 14-1172 (La.10/14/15), 179 So.3d 579, the Court held that a twenty-five year maximum sentence1 for simple rape (without the benefit' of párole, probation, or suspension of sentence) that ran concurrently with a thirty-year sentence for a separate forcible rape was not unconstitutionally excessive. The defendant, a first-felony offender with “a couple” of misdemeanor convictions, was tried in 2009 for two» counts of forcible rape — the rapes of two twenty-year-old women in 2004 and 2006. .He was convicted of forcible rape in *273 the 2004 case and the lesser offense of simple rape in the 2006 case. In sentencing, the district court stated that the crimes “manifested deliberate cruelty to the victims; that the offenses were violent and brutal in nature; and that the offenses resulted in significant physical and psychological suffering to the victims.” Id. ■ at 682. On appeal, the court of appeal held that the twenty-five year sentence for the simple rape conviction was unconstitutionally excessive. The Louisiana Supreme Court granted the state’s application for writ of certiorari and reversed:
[T]he evidence related to the similar sexual assaults in this case shows that this defendant had engaged in a pattern of preying on young, incapacitated women, a factor the district court, was free to consider in rendering the sentences in this case. Considering defendant’s 2006 rape of J.H. in the context of his behavior over an extended period of time, rather than in isolation, we are unable to find that the district court manifestly abused its broad sentencing discretion by imposing the maximum term of imprisonment for the rape of J.H., particularly since the district court would have been justified in ordering consecutive sentences in this case, thus, extending the period for parole ineligibility. Under the facts of this particular case, the reduction in sentencing exposure* that defendant received [aaby the district court’s decision to order the sentences to run concurrently .supports the constitutionality of defendant’s simple rape sentence. ■ ' -
Id. at 585-86.
In its analysis, the Supreme Court noted that a comparison of the defendant’s punishment for the simple rapé conviction with sentences imposed for similar crimes, “particularly” in State v. Clark, 05-0647 (La.App. 3 Cir. 12/30/05), 918 So.2d 552, and State v. Cleveland, 12-0163 (La.App. 4 Cir. 4/10/13), 115 So.3d 578, “raises questions as to the district court’s imposition of the maximum sentence- in . this case,” Fruge, at 584. The Court did not randomly select these two cases; both had been cited by the Third Circuit When finding the twenty-five-year sentence for simple rape exces.sive-presumably because both cases involved inebriated victims.
■ In Clark, the defendant was sentenced to serve- fifteen years at hard labor for simple rape.. He was a thirty-one-year-old first-time-felony offender who had met the victim in a social setting, and -later overpowered the intoxicated victim while she slept. The defendant was a single father raising his •• daughter. He* spent- over twelve years as a member of the U.S. Army, receiving an honorable discharge, and later served in the National • Guard. His mother, sister, and daughter all testified on his behalf. He expressed an acceptance of responsibility for his actions, which constituted simple rape, and he apologized to the. victim and her fanjily. The Third Circuit found the fifteen-year sen-tehee excessive and remanded the-case for resentencing with instructions that five' years or less. wa's appropriate. The only aggravating factor was an attempted sexual contact the same night with another woman, who declined the defendant’s advances, resulting in no crime. • ,
| ac.In Cleveland, this court held that a fifteen-year sentence for simple rape was not excessive, finding that the record provided an adequate basis for it. There, witnesses observed the inebriated and unresponsive victim on *the sidewalk near the Bridge' Lounge with her “clothes open” and the defendant performing oral sex on her while another male with “his stuff out” was sucking on her breasts.
Despite the comparison of the- twenty-five-year sentence with sentences for simi *274 lar crimes, the Court also cited the well-settled rule that: “While a comparison of sentences imposed for similar crimes may provide some insight, ‘sentences must be individualized' to the particular offender and to the particular offense committed.’ ” Fruge, 179 So.3d at 584.
Jones argues that is he not one of the most egregious offenders for whom the maximum sentence was intended. However, the trial court obviously felt otherwise, effectively stating that it believed Jones was guilty of forcible rape instead of the lesser included offense of simple rape for which he was convicted. We do not find that the trial court was incorrect, given that at the time of the crimes, simple rape was defined by La. R.S. 14:48 as follows:
A. Simple rape is a rape committed when the anal, oral, or vaginal sexual intercourse is deemed to be without the lawful consent of a victim because it is committed under any one or more of the following circumstances:
(1) When the victim is incapable of resisting or of understanding the nature of the act by reason of a stupor or abnormal condition of mind produced by an intoxicating agent or any cause and the offender knew or should have known of the victim’s incapacity.
(2) When the victim, through unsoundness of mind, is temporarily or permanently incapable of understanding the nature of the act and the offender knew or should have known of the victim’s incapacity.
|a4(3) When the female victim submits under the belief that the person committing the act is her husband and such belief is intentionally induced by any artifice, pretense, or concealment practiced by the offender.
None of the circumstances of simple rape fit the evidence presented in the present case. Further, as discussed infra, the evidence was sufficient to support Jones’ conviction of simple rape because it was sufficient to support the greater charged offense of forcible rape. Thus, Jones was in fact one of the most egregious types of offenders of those convicted of simple rape. Further, the victim’s five-year-old son heard the sounds of the battery and rape of his mother from the living room. Finally, D.M. testified to prior physical abuse by Jones in April 2012, during which she received a black eye, a cut on her lip, and a scalp wound resulting from him ramming her head into a door. She testified that she got tired of him hitting her as he had done throughout their relationship; she finally left him after the April 2012 abuse.
Unlike the cases cited, this case did not involve the rape of an inebriated victim. Nor did those cases involve the type of physical violence perpetrated upon the victim by Jones. The severe and lingering emotional scars were evident in D.M.’s victim impact statement.
The “only relevant question on review” of a sentence for excessiveness is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate. Fruge, 179 So.3d at 584.
Viewing all the facts and circumstances of the present case, we do not find that the maximum sentence imposed on Jones makes no measurable contribution to | SRacceptable goals of punishment, is nothing more than the purposeless imposition of pain and suffering, or is grossly out of proportion to the severity of the crime.
This assignment of error has no merit.

PRO SE ASSIGNMENTS OF ERROR

Jones filed a pro se brief designating pro se assignments of error Nos. 4-6, obviously following in sequence his appellate *275 counsels assignments of error Nos. 1-3. Jones’ second pro se assignment of error was addressed above with his counseled assignment of error No. 2. His remaining assignments of error will be designated by us as No. 1 and No. 3.

PRO SE ASSIGNMENT OF ERROR NO. 1

.. In his first.pro se assignment of error, Jones argues that the evidence was insufficient to support his conviction for either of the offenses for-which he. was convicted, simple rape or second degree battery. ■.
This court set forth the well-settled standard of review for sufficiency of the evideneé in State v. Watkins, 13-1248, p. 13-14 (La.App. 4 Cir. 8/6/14), 146 So.3d 294, 303, as follows:
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Green, 588 So.2d 757 (La.App. 4 Cir.1991). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). The reviewing court must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier’s view of all the evidence most favorable to the prosecution, must be adopted. The fact | ^finder’s discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mussall; Green; supra. “[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence.” State v. Smith, 600 So.2d 1319, 1324 (La.1992).
In addition, when circumstantial evidence forms- the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common; experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from Jackson v. Virginia, supra, but . rather an evidentiary guideline, to facilitate appellate review of whether. a rational jurqr- could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La.1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817 (La.1987).
Id. at pp. 13-14, 146 So.3d at 303.
The testimony of a single witness, if believed by the trier of fact, may be sufficient to support a conviction. Id., citing State v. Wells, 10-1338, p. 5 (La.App. 4 Cir. 3/30/11), 64 So.3d 303, 306. A fact finder’s decision concerning the credibility of a witness will not be'disturbed unless it is clearly contrary to the evidence. Id."
The due process standard of review under Jackson -v. Virginia does not sanction juror speculation if the evidence is such that a reasonable fact finder .-must have a reasonable doubt. State v. Higgins, 03-1980, pp.17-18 (La.4/1/05), 898 So.2d 1219, 1232; State v. Gordon, 13-0495, p. 18 (La.App. 4 Cir. 7/16/14), 146 So.3d 758, 770)
*276 \mCount 2 — Simple Rape
As noted in addressing Jones’ counseled assignment of error No. 3; the facts of this case do not fit either of the three categories or acts constituting simple rape, as defined by La. R.S. 14:43. However, Jones,went to trial on Count 2 on a charge of forcible rape, a violation of La. R.S. 14:42.1. Simple rape was a responsive verdict to, and a lesser included offense of, the charged offense, of forcible rape. La.C.Cr.P. art.,814 A(10).
' It is well-settled that if the evidence adduced at trial was sufficient to support a conviction of the charged offense, the jury’s responsive verdict is authorized. State v. Harris, 97-2903, p. 8 (La.App. 4 Cir. 9/1/99), 742 So.2d 997, 1001. See also State v. Johnson, 01-0006, p. 4 (La.5/31/02), 823 So.2d 917, 920 (evidence sufficient to support conviction of the greater offense will necessarily support conviction of a lesser and included offense). A lesser and included offense is one in which all essential elements are also essential elements of the greater charge, such that evidence sufficient to support a conviction of the charged offense necessarily supports a conviction on the lesser offense. State v. Manning, 03-1982, p. 66 (La.10/19/04), 885 So.2d 1044, 1101.
At the time of these, crimes, La. R.S. 14:41 defined rape as “the act of anal, oral, or vaginal sexual intercourse with a rriale or female person committed without the person’s lawful consent.” When these crimes were committed, forcible rape was defined by La. R.S. 14:42.1, in part as:
A. Forcible rape is rape committed when the anal, oral, or vaginal sexual intercourse is .deemed to be without the lawful consent of the victim because it is committed under any-one or more of the following circumstances:
las(l) When the victim is prevented from resisting the act by force or threats of physical violence under circumstances where the victim reasonably believes that such resistance would not prevent the rape.
Viewing all the evidence in a light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that Jones forced D.M. to have vaginal sexual intercourse without her consent because she was prevented from resisting the act by force or threats of physical violence under circumstances where D.M. reasonably believed that such resistance would not prevent- the rape. Thus, given that the evidence was sufficient to convict Jones for the offense of forcible rape as charged in amended Count 2 of the indictment, the evidence necessarily was sufficient to convict-, .him of the lesser and included offense of simple rape.
No merit exists to the claim that the evidence was insufficient to convict Jones of simple rape.
Count 1 — Second Degree Battery
Jones also argues that the evidence was insufficient to convict him of the crime of second degree battery, a responsive verdict to the charged offense of aggravated second degree battery.
Second degree battery was defined at the time of the crimes in the, present case by La. R.S. 14:84.1, in pertinent part, as follows: ,
■ A; Second degree battery is a battery when the offender intentionally inflicts serious bodily injury; however, this provision shall not apply to a medical provider who has obtained the consent of a patient.
B. For purposes of this Section, the following words shall have the following meanings:
[[Image here]]
*277 |,⅛(3) “Serious bodily injury” means bodily injury which involves unconsciousness, extreme physical pain or protracted and obvious disfigurement, or protracted loss or impair- • ment of the function- of a bodily member, organ, or mental faculty, ■or a substantial risk of death.
D.M. said Jones, beat and choked her, and the evidence established that she had a black left eye and considerable swelling on the left side of her face after the attack. In testifying about the choking, D.M. said “[h]e kept getting tighter and tighter and tighter,” and that when she stated what he wanted her to say, he let her go. She also testified that Jones held, a knife to her stomach and’ when she grabbed it, he pulled the knife away, slicing her fingers open. She said she was holding her hands up in the air to stem the bleeding and had a towel wrapped around it. D.M. subsequently testified that she ended up in the bed naked ánd she did not know how she got there.
In State v. Stowe, 93-2020 (La.4/11/94), 635 So.2d 168, the defendant was convicted of the second degree battery of a police officer after the officer responded to a call of an injured person (the intoxicated defendant) walking along- the highway. The officer learned that the defendant had' earlier fought with his wife and punched through a window, resulting in a deep cut on his arm that was dripping blood. When the defendant became hostile and threatening, the officer advised him that he was under arrest for disturbing the peace. The defendant suddenly hit the officer in the head, knocking him backward into a ditch. The officer tried to remove his ASP expandable baton, but the defendant continued to Rfthit the officer. The officer was finally able to handcuff him with the assistance of two bystanders.
The report of the emergency room physician who treated the officer reflected that the officer had edema and a contusion under his right eye, abrasions on his- fore-. head, lip, and under his right eye, as well as contusions and some edema on his forehead. The physician testified at trial that the officer denied that he was in pain, but said he had treated patients who denied pain even though it was obvious they were in pain. The officer testified that when he got to the hospital one eye was nearly completely swollen shut and he had bruises and abrasions all over his face. He said he had knots on his head, a large one on his chin, and that he still had a small knot on his chin from the incident at the time of trial. - Both of his eyes were blackened, and he had a nose bl’eed: and a cut lip. The officer also testified that a large “place” under his eye stayed there for about two weeks before' it began going down.’ He had severe headaches day and night for approximately two weeks.
The Supreme Court found that, reviewing the eyidence in a light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the state proved the defendant had intentionally inflicted extreme physical pain ori the officer without his consent.
In State v. Helou, 02-2302 (La.10/23/03), 857 So.2d 1024, the defendant punched the victim in the nose with his fist causing him to bleed profusely, saturating his shoes, the front, of his jeans and his shirt with blood, and leaving puddles of blood on the ground. The defendant was. tried and .convicted of second degree battery. After the court of appeal affirmed the conviction,, the Supreme Court granted certiorari' and reversed, with three justices dissenting, and the majority reasoning:
[41The State submits that we must infer from the amount of bleeding that the victim suffered -a “severe bodily injury.” *278 This Court finds that the presence of blood alone does riot satisfy the “serious bodily injury” element of second- degree battery. Our jurisprudence demonstrates many cases where the State proved the “serious bodily injury” element of second degree battery. Some examples are: 1) State v. Abercrumbia, 412 So.2d 1027 (La.1982), where the defendant hit the victim with boards across his head, neck, and arm, causing a “deep cut over his right eye;” 2) State v. Robertson, 09-0883 (La.App. 3d Cir.12/9/98), 723 So.2d 500, writ denied, 09-0658 (La.6/25/99), 745 So.2d 1187, where the defendant knocked the victim to the ground and repeatedly kicked and hit her until she “kind of lost her senses for a minute;” the victim had bruises and contusions over the entire extent of her body, which left significant scars and lacerations on her nose; and 3) State v. Robinson, 549 So.2d 1282, 1285 (La.App. 3d Cir.1989), where the defendant stabbed the victim twice with a large, folding knife.
There are other cases which indicate that less substantial 'injuries may also constitute “serious bodily injury.” See State v. Young, 0-1437, pp. 9-10 (La.11/28/01), 800 So.2d 847, 852-853, where the victim suffered a bloody nose, tenderness in hyoid area below the larynx, and complained of pain at incision in his lower abdominal area. The physician testified that the defendant’s act of choking the victim could have resulted in substantial risk 'of death, and three months after the attack, the victim continued to have throat problems; State v. Diaz, 612 So.2d 1019, 1022-1023 (La.App. 2d Cir.1993), where the defendant broke the victim’s jaw during a group fight; State v. Mullins, 537 So.2d 386, 391 (La.App. 4th Cir.1988), where a 6 foot tall defendant punched a 5'5" girlfriend, breaking her nose; State v. Legendre, 522 So.2d 1249, 1251 (La.App. 4th Cir.1988), writ denied, 523 So.2d 1321 (La.1988), where the defendant raised- the victim over his head and smashed her to the floor, rendering her momentarily immobile and requiring a brief hospitalization followed by outpatient treatment leading to a loss of employment for several weeks; State v. Accardo, 466 So.2d 549, 552 (La.App. 5th Cir.1985), writ denied, 468 So.2d 1204 (La.1985), where a 17-year-old female victim was struck on the head by the defendant- with either' his fist or a blackjack, causing the side of her face to swell.
UgAfter a careful review of LSA-R.S. 14:34.1 and the related jurisprudence, we find that in the case sub judice, the State failed to offer any evidence of “extreme physical pain” by way of testimony from the fact witnesses. Nor do we have testimony from medical witnesses or medical records, which would prove this factor. Rather, the evidence presented, dealt solely with the amount of blood the victim lost. The record demonstrates that at trial the State’s direct examination of its witnesses completely avoided the subject of pain. We cannot infer that the loss of blood is tantamount to “extreme physical pain.” We also cannot infer that a punch in the nose, without more evidence, is sufficient to support a conviction of second degree battery.
In summary, there is no testimony that the victim lost consciousness at any time despite the victim’s “confusion” as to whether his wife rode with him in the ambulance to the hospital. There is no evidence of severe injury. In fact, the victim initially declined medical help; he required only a brief visit to the emergency room; thereafter, he sought no further medical attention; and there is *279 no evidence of disfigurement or permanent disability. No medical personnel appeared at trial to provide jurors with a diagnosis or a summary of the victim’s treatment. The only evidence in the record is the medical 'bill for $983.90. There was no explanation of what medical services were provided to the victim. Because the State failed in its burden of proof, any conclusion by the jury as to pain, suffered by the victim was simply a guess on the jury’s part, since the State failed to offer any evidence on the issue. Simply put, because the jury had to infer the victim’s pain, the State failed to prove beyond a reasonable doubt that the victim, in fact, suffered “extreme physical pain” as required by the statute. Accordingly, we conclude that the evidence'is insufficient to sustain the defendant’s conviction for second degree battery.
Id. at pp. 6-9, 857 So.2d at 1028-1029.
In the case at bar, evidence exists that D.M. might have lost consciousness on two separate occasions. The only time she expressly referred to losing consciousness was in testifying in reference to when.she “ended up” in the bed |4Snaked, when she testified: “I don’t know if I lost conscious [sic] or — I just felt like — it felt like I went to sleep.”
Nevertheless, viewing all the evidence in a light most favorable to the prosecution, the jury could have found beyond a reasonable doubt that D.M. sustained “obvious disfigurement” of her fingers and lost consciousness, however momentary that might have been. Thus, any rational trier of fact could .find all the elements of the crime of second degree battery present beyond a reasonable doubt.
The evidence was sufficient to sustain Jones’ conviction in Count 1 for second degree battery and his conviction in Count 2 for simple rape. This pro se assignment of error has no merit. ■
PRO 'SE ASSIGNMENT OF ERROR NO. 3 1
In his third pro se assignment of error, Jones argues thát the trial court erred in allowing the state to make prejudicial comments during closing arguments.
Jones does not quote the comments, but instead lists page numbers of the record where , the state allegedly made them and Jones’ trial counsel, lodged objections. Jones makes a conclusory argument as.to all of the alleged improper-¡comments, asserting that the comments , “influenced .the jury and prejudiced Mr. Jones, which violated Mr. Jones [sic] United States Constitution 6th and 14th Amendments [sic]. His right to, a fair, trial and .due process and equal protections [sic] clauses under the Louisiana Constitution.of 1974 Articles 1 [sic] § 1, 2, 3 and 16-were violated.”
The scope of dosing argument shall be confined to the evidence admitted, the lack of evidence, conclusions of fact that the state’ or the defendant may draw therefrom, and the law ápplicable to the case. The argument shall not appeal to' prejudice. |44The state’s rebuttal shall be confined to answering the argument of the defendant.
La.C.Cr.P. art. 774. A prosecutor should refrain from making personal attacks on defense counsel and strategy. State v. Celestine, 12-1541, p. 10 (La.App. 4 Cir. 12/18/13), 131 So.3d 947, 954, writ denied, 14-0158 (La.8/25/14), 147 So.3d 699. Closing argument shall not appeal to prejudice. State v. Simms, 13-0575, p. 18 (La.App. 4 Cir. 6/18/14), 143 So.3d 1258, 1269, writ denied, 14-1542 (La.2/27/15), 160 So.3d 963.
However, ’ prosecutors have wide latitude in their closing argument. State v. Haynes, 13-0323, p. 12 (La.App. 4 *280 Cir. 5/7/14), 144 So.3d 1083, 1090. A trial court has broad discretion in controlling the scope of closing arguments. State v. Webb, 13-0146, p. 26-27 (La.App. 4 Cir. 1/30/14), 133 So.3d 258, 275-276, writ denied, 14-0436 (La.10/3/14), 149 So.3d 793, cert. denied sub nom., Webb v. Louisiana, — U.S. —, 135 S.Ct. 1719, 191 L.Ed.2d 689 (2015). Even where a prosecutor exceeds the bounds of proper argument, a reviewing court will not reverse a conviction unless thoroughly convinced that the argument influenced the jury and contributed to the verdict. State v. Caliste, 12-0533, p. 17 (La.App, 4 Cir. 9/4/13), 125 So.3d 8,18. Further, common sense and logic suggests that in this respect the reviewing court must be thoroughly convinced that the improper argument influenced the jury and contributed to it rendering a verdict based, at least in part, on prejudice or some reason other than the weight of the'evidence presented.[8] Credit should be accorded to the good sense and fair-mindedness of. the jurors who have heard the ^evidence. State v. Bailey, 12-1662, p. 8 (La.App. 4 Cir. 10/23/13), 126 So.3d 702, 707.
Several of the page numbers from the record cited by Jones contain comments to which defense counsel lodged objections that were sustained. Thus, the trial court did not allow the prosecutor , to make the comments and therefore committed no. error. In the rebuttal argument, two defense objections were made and sustained on three pages of transcript. . One ^defense objection was made and sustained in another instance.
At one point, the prosecutor stated:
Ladies and Gentlemen, I will submit to you there is no more difficult case to try in this building than a rape case. There is mo one that is more scrutinized on that witness stand than a victim to a sexual assault, not a witness to a murder, not a victim to a shooting.. There is no one that is picked apart—
The defense objected and the objection was overruled. The prosecutor continued:
—and analyzed more than a rape victim and Ms. Ellis did that through her entire close, Ladies and Gentlemen.
Ladies and Gentlemen, when you come'and sit on a Jury of a rape case there is typically two defenses that the defense attorney can make.
The defense again objected and the objection was, overruled. The prosecutor continued by stating that the first defense was that “[i]t wasn’t me. I wasn’t the one who. did this,” and the second defense was “[t]hat is not the way it happened, it is the victim’s fault.” The prosecutor then proceeded into her argument as to the evidence in the case. This latter “two-defense” comment and argument was not improper rebuttal because it was merely a lead into the prosecutor’s argument as to the defense’s attack on the evidence in the case.- As to the former comment by the 1 ^prosecutor, even if one were to assume that it was improper, we do not And that one would be thoroughly convinced that the argument influenced the jury and contributed to the verdicts.
Further in' closing argument, thé prosecutor stated: “You never heard from any other Defense witnesses regarding a fight — .” Defense counsel objected that the defense had no obligation to present a defense, but the objection was overruled. We do not find that one would be thor *281 oughly convinced that the comment influenced the jury and contributed to the verdicts.
During closing argument, defense counsel made two objections to comments by the prosecutor. The first comment was: “The defense came up here yesterday morning and I’m still left with question marks.” The second comment was: “[A]t the 'end of this, when’ I sit down, I ask you what are the answers to the questions that the Defense gave you.” In both objections defense counsel stated (began to state): “We' have no burden in this — .” Although Jones does not specify why the comments were objectionable, the content of the defense objections make clear that defense counsel treated the comments as relating to the defense not providing answers to some' aspect of the case when presenting its defense. However,’ one can argue that the thrust of the second comment was that the defense simply did not provide answers to questions it had raised during its own closing argument. ‘That is, the state’s second comment was not directed to what the defense did or did not do during the trial. Rather, it was directed to the content or lack thereof of the defense’s closing argument. Therefore, we find this was not a reference by the state to any burden on the defense to come forward with evidence. It was an answer to the Jones’ closing argument, proper rebuttal under La.C.Cr.P. art. 774.
|47Even assuming that all the objected-to comments by the prosecutor that wére overruled were improper, considering the evidence as- a whole, and crediting the good sense and fair-mindedness of the jurors, we do not find that one would be thoroughly convinced that these comments influenced the jury and contributed to the verdicts. Thus, Jones has failed to show any violation of what he claims were his constitutional rights to' a fair trial, due process, and/or equal protection of the laws.
No merit exists to the third and final pro se assignment of error.

CONCLUSION

For the foregoing reasons, Jones’? convictions and sentences are affirmed.

AFFIRMED.

BELSQME, J., concurs in the result.
DYSART, J., concurs in the result.

. La. R.S. 14:42, as amended by La. Acts 2015, Ño. 184, § 1, effective 1 August 2015, now classifies aggravated rape as “first degree rape.” Subsection E of the amended statute provides that "[a]ny act in violation of the provisions of this Section committed on or after August 1, 2015, shall be referred to as ‘first degree rape’.” :

. La. R.S. 14:42.1, as amended by La. Acts 2015, No. 184, § 1, effective 1 August 2015, now classifies forcible rape as “second degree rape.” Subsection C of the amended statute provides that "[a]ny act in violation of the provisions of this Section committed on or after August 1, 2015, shall be referred to as ‘second degree rape’.”

. La. R.S. 14:43, as amended by La. Acts 2015, No. 184, § 1, -effective 1 August 2015, now classifies simple rape as “third degree rape.” Subsection C of the amended statute provides that "[a]ny act in violation of the provisions of this Section committed on, or after August 1, 2015, sháll be referred to as ‘third degree rape’.”

. An incident recall is the printed version of the information taken down during a 911 call.

. We note the variation in dates stated in the record. Based upon the totality of the facts, the small variations are meaningless.

. This statutory scheme is discussed further infra in connection with Jones’ second argument in this assignment of error.

. The res géstae doctrine holds that otherwise inadmissible evidence (hearsay, for example) may be admissible "when it is related and intertwined with the charged offense to such an extent that the state could not have accurately presented its case without reference to it.” State v. Colomb, 98-2813, p. 3 (La.10/1/99), 747 So.2d 1074, 1075, quoting State v. Brewington, 601 So.2d 656, 657 (La.1992). The doctrine encompasses "not only spontaneous utterances and declarations made before and after commission of the crime but also testimony of witnesses and police officers pertaining to what they heard or observed before, during, or after the commission of the crime if the continuous chain of events is evident under the circumstances.” Colomb, 98-2813, p. 3, 747 So.2d at 1075-76, quoting State v. Molinario, 383 So.2d 345, 350 (La.1980).

. Cf, Authors’ Note (3), La. C.E. art. • 403, Handbook on Louisiana ‘Evidence Law, Pugh, Force, Rault & Triche.-p. 387 (2014) (Unfair prejudice as used in La. C.E. art. 403 means that "the offered evidence has 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.’ ’’).